Robert A. Tandy, Esq.(RT0387)
Law Office of Robert A. Tandy, LLC
50 Tice Boulevard, Suite 250
Woodcliff Lake, NJ 07677
Phone: (201) 474-7103
Fax: (201) 474-7101
Email: rtandy@tandylaw.com
Co-Counsel for Plaintiff,
David Gonzalez

Eric J. Warner, Esq. (EW3946)
LAW OFFICE OF ERIC J. WARNER, LLC
991 US Highway 22, Suite 200
Bridgewater, NJ 08807
Phone: (201) 403-5937
Fax: (877) 360-0508
Email: eric@ejwlawfirm.com
Co-Counsel for Plaintiff,
David Gonzalez

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAVID GONZALEZ,<br><br>Plaintiff,<br><br>vs.<br><br><br><br>BAM TRADING SERVICES, INC., d/b/a BINANCE US, a Delaware corporation; BINANCE HOLDINGS, LTD, d/b/a BINANCE, a foreign company; CHANGPENG ZHAO; JOHN DOES 1-100 (fictitious names); XYZ CORP, INC. 1-100 (fictitious names),<br><br>Defendants. | CVIL CASE NO.:<br><br>*Civil Action*<br><br>**VERIFIED COMPLAINT & JURY DEMAND** |

Mr. David Gonzalez (hereinafter referred to as "Plaintiff" or "Mr. Gonzalez"), by way of this Complaint (the "Complaint") against Defendants, BAM Trading Services Inc. d/b/a Binance.US ("BAM," "BAM Trading," or "Binance.US"); Binance Holdings, Ltd. d/b/a Binance ("Binance" or "Binance.com"); CHANGPENG ZHAO ("CZ" or "Zhao"); John Does (1-100); and XYZ Corp, Inc. (1-100), alleges, based upon personal knowledge as to himself and his own acts and experiences, and on information and belief as to all other matters based upon, *inter alia*, the investigation of counsel, as follows.

<u>**NATURE OF THE ACTION**</u>

1.    Defendant Binance formed and operates Binance.com, a major cryptocurrency exchange where customers deposit, trade, and withdraw, hundreds of types of digital assets, including cryptocurrencies and tokens (collectively, "cryptocurrency" or "crypto"), such as Bitcoin ("BTC"), Ethereum ("ETH") and others. Since its founding in July 2017 by Defendant CZ, Binance.com has earned billions of dollars in fees on crypto transactions worth trillions of dollars and other services, and under CZ's control, Binance.com had become the world's largest cryptocurrency exchange by early 2018. Binance.com's rapid growth was fueled in large part by Binance.com targeting the large and lucrative U.S. crypto market and by ignoring and willfully violating numerous

U.S. laws and regulations in place to protect consumers, investors, and American national security, which would have limited Binance.com's access to the U.S. market and slowed its growth.

2.    Defendants, among other things, knowingly failed to register as a money services business ("MSB") or foreign money transmitters in the State of New Jersey, willfully violated the Bank Secrecy Act ("BSA") by failing to implement and maintain an effective anti-money laundering ("AML") program, disregarded crucial know your customer ("KYC") rules, and willfully caused violations of U.S. economic sanctions issued pursuant to the International Emergency Economic Powers Act ("IEEPA"), in a deliberate and calculated effort to profit from the U.S. market, without implementing controls required by U.S. law.

3.    Defendants' willful disregard of these important laws and regulations turned Binance.com into a magnet and hub for criminals, users from sanctioned jurisdictions, terrorists, and other bad actors, because Binance.com became a critical part of their efforts to launder crypto which was stolen or obtained by other unlawful means. Binance.com became a preferred-choice as the "get-away driver" for a large number of bad actors.

4.    Under normal circumstances, a core attribute of cryptocurrency transactions is that there is a permanent record of those transactions on the public blockchain, and the chain-

of-title of cryptocurrency is permanently and accurately traceable on the blockchain, which acts as a "ledger."

5.    That is why Plaintiff was able to determine, following a thorough investigation tracing the blockchain, that a hacker had deposited his cryptocurrency with Defendants.[1]

6.    Without a place to launder crypto, such as Binance.com, if a bad actor steals someone else's crypto, there is a risk the authorities would eventually track them down by retracing their steps on the blockchain and they would need to constantly look over their proverbial shoulders. Because CZ and others at Binance put profits before the law, Defendants, through the operation of Binance.com, generated substantial amounts of proceeds by offering bad actors a way to remove the connection between the ledger and their digital assets so the digital assets would no longer be traceable.

7.    As Binance and CZ felt increasing regulatory pressure to implement KYC and AML policies, Defendants Binance, CZ, and BAM Trading formed a new crypto-exchange named Binance.US in 2019 (collectively, with Binance.com, the "Binance Platform"), which was purportedly for U.S.-based customers. In reality, Binance.US was created as a distraction for U.S. regulators so that

---

[1] See a true and accurate copy of Plaintiff's blockchain ledgers and proof of his deposit of funds from his Chase bank account into Coinbase annexed hereto as **"Exhibit A."** Similarly, Plaintiff had an expert trace report showing the hacking of his valuable assets, which is attached hereto as **"Exhibit B."**

Binance.com could continue targeting lucrative U.S.-based customers like usual.

8.    Binance.com acted as a depository for millions of dollars of cryptocurrency removed from the digital wallets, accounts or protocols of individuals and entities located in the United States, such as Plaintiff, as a result of hacks, malware, theft, or ransomware. Defendants acted together in furtherance of a scheme to maximize revenues for Binance.com from all sources, including U.S.-based users, sanctioned users, criminals, crypto-thieves, and accounts previously identified as being connected to illegal conduct. Defendants and co-conspirators operated the Binance Crypto-Wash Enterprise (defined below), which enabled bad actors to transfer assets generated through criminal activity to Binance.com, exchange those assets for different assets on Binance.com's exchange, and then transfer those newly "cleaned" assets out of Binance.com so the assets were no longer associated with the original assets or traceable on the ledger. The Binance Crypto-Wash Enterprise became a leading conduit of stolen cryptocurrency, enabling bad actors to seamlessly transfer stolen crypto around the U.S. and the world.

9.    Eventually, the authorities caught up with Defendants. On November 21, 2023, Defendants Binance and CZ pled guilty to criminal charges and regulatory violations by the United States

Department of Justice ("DOJ"), arising out of the scheme alleged herein and paid more than $4.3 billion in penalties. In connection with their guilty pleas, Defendants Binance and CZ agreed to the statement of facts attached to the Binance Plea Agreement (the "DOJ SOF").[2] The Defendants also entered into settlements with the Commodity Futures Trading Commission ("CFTC"), U.S. Department of the Treasury ("Treasury"), through the Financial Crimes Enforcement Network ("FinCEN"), the Office of Foreign Assets Control ("OFAC"), and IRS Criminal Investigation ("CI"). The U.S. Securities and Exchange Commission ("SEC") filed an action against Defendants for violations of the federal securities laws.

10. In an effort to be granted leniency in sentencing, CZ sent a letter to the judge overseeing the DOJ action and took full responsibility for Binance.com's failure to implement AML and KYC procedures as required under the law, stating in part:

> I should have focused on implementing compliance changes at Binance from the get-go, and I did not. **There is no excuse for my failure to establish the necessary compliance controls at Binance.**
>
> ***
>
> Words cannot express how deeply I regret my choices that result in me being before the Court. Rest assured that it will never happen again.

11. Plaintiff alleges claims for violations of the

---

[2] See a true and accurate copy of the Plea Agreement and DOJ SOF annexed hereto as **"Exhibit C."**

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c)-(d); conversion, and aiding and abetting conversion. Plaintiff is not relying on any contracts or agreements entered into between Binance or BAM Trading (including Binance.US) and any users of Binance.com or Binance.US to assert any claims herein and none of Plaintiff's claims derive from the underlying terms of any such contracts or agreements. Plaintiff is not relying on any actions Defendants have taken or could have taken, or benefits Defendants have received or could have received, pursuant to the terms of any contracts or agreements with users of Binance.com or Binance.US.

12. Rather, Plaintiff's claims are based on Binance and CZ, aided and abetted by BAM Trading, violating federal statutory obligations and engaging in the conversion of, and aiding and abetting the conversion of, cryptocurrency properly belonging to Plaintiff. Specifically, Defendants, *inter alia*, (i) committed, and aided and abetted, acts constituting indictable offenses under 18 U.S.C. § 1960 (relating to illegal money transmitters) and § 1961(1)(E) (act indictable under the Currency and Foreign Transactions Reporting Act a/k/a the Bank Secrecy Act ("BSA")), and (ii) aided and abetted acts constituting indictable offenses under 18 U.S.C. § 1956 (laundering of monetary instruments), § 1957 (engaging in monetary transactions in property derived from specified unlawful activity), and § 2315 (relating to interstate

transportation of stolen property).

13. Plaintiff seeks damages and equitable relief including, but not limited to: treble his money damages; restitution; injunctive relief; damages; costs and expense, including attorneys' and expert fees; interest; and any additional relief that this Court determines to be necessary or appropriate to provide complete relief to Plaintiff.

## THE PARTIES

14. Plaintiff David Gonzalez is a citizen of New Jersey who resides in Pequannock, New Jersey. On or about May 8, 2021, a third party stole at least 41,881,332,772 units of Shiba Inu (SHIB), 90,934,964,476,560.50 units of Hokkaidu Inu (HOKK), 6,677,846,866,673.65 units of Kishu Inu (KISHU), 1,985,208,578.34 units of Akita Inu (AKITA), 1,382,788,310,243.34 units of FEG Token (FEG), 53,436.64 units of Hydro (HYDRO), 123.3706939 units of Paid Network, 578.2658609 units of DigiCol Token, and other cryptocurrencies from Plaintiff's Coinbase account, such as ETH to pay transaction fees, a/k/a "Gas Fees." In or around May and June, 2021, more ETH and other cryptocurrencies were stolen from Plaintiff's Coinbase account. The unknown hacker went dormant in November 2021, but reappeared in Plaintiff's wallet in or around August 2024 to liquidate ERC20 tokens that had little to no value. After extensive investigation, it was determined that cryptocurrency

stolen from Plaintiff was sent to at least one Binance.com account. Upon information and belief, Binance.com failed to apply KYC and AML procedures as required by statutory law to detect lawful ownership of the cryptocurrency properly belonging to Plaintiff. In the days, weeks, months, and years thereafter, Binance allowed the stolen units of various cryptocurrencies to be deposited in Binance.com accounts in exchange for which Binance earned transactions fees. Between May 8, 2021, and the date of this filing, the total value of the cryptocurrencies stolen from Plaintiff fluctuated, but is believed to have been valued at the portfolio's high at over $3 trillion dollars. At no time has Plaintiff ever held an account with Binance or BAM, nor has Plaintiff ever agreed to any terms of use that Binance or BAM impose upon their account holders.

15. Defendant BAM is a Delaware corporation with its current headquarters and principal place of business in Miami, Florida. It is wholly owned by BAM Management U.S. Holdings Inc., which is 81 percent owned by the founder of Binance, Changpeng Zhao ("CZ").[3] CZ and Binance created BAM Management and BAM Trading in the United States and claimed publicly that these entities independently controlled the operation of the Binance.US platform. Behind the scenes, however, CZ and Binance were

---

[3] *SEC v. Binance*, Case No. 1:23-cv-01599 (D.D.C.), D.E. 1, Compl. (June 5, 2023) (hereinafter "*SEC Compl.*") ¶¶ 28-29.

intimately involved in directing BAM Trading's U.S. business operations and providing and maintaining the crypto asset services of the Binance.US platform. Binance.US sought to obtain, and obtained, a license to operate as a money transmitter in the State of New Jersey, advertised that it was able to serve customers in New Jersey, and provided services to numerous customers located in New Jersey. Today, the BAM platform is available in 46 U.S. states, including the State of New Jersey, and 8 U.S. territories; is one of the top five crypto asset trading platforms in the United States by trading volume; and as of May 1, 2023, Binance.US's average 24-hour trading volume was valued at over $174 million.

16.   Defendant Binance is a foreign company which, upon information and belief is registered and headquartered with its principal place of business in the Cayman Islands, though it professes to not have a principal executive office.[4] Since at least July 2017, Binance has operated cryptocurrency trading platforms, including the platform located at Binance.com since 2017 and the platform at Binance.US, since 2019. At all relevant times, Binance has been illegally operating as an unlicensed foreign money transmitter in the State of New Jersey, engaging in the business of the receipt of money for transmission or

---

[4] Paddy Baker, *Binance Doesn't Have a Headquarters Because Bitcoin Doesn't, Says CEO,* COINDESK (May 8, 2020), https://www.coindesk.com/binance-doesnt-have-a-headquarters-because-bitcoin-doesnt- says-ceo.

transmitting money to locations outside of the United States by any and all means, including but not limited to payment instrument, wire, facsimile, electronic transfer, or otherwise for a fee, commission or other benefit.

17.  Defendant Changpeng Zhao ("CZ" or "Zhao"), is the beneficial owner of a number of entities subordinate to or affiliated with Binance, in multiple jurisdictions, has been publicly dismissive of "traditional mentalities" about corporate formalities and their attendant regulatory requirement.[5] CZ claims Binance's headquarters is "wherever [he] sit[s]" and "wherever [he] meet[s] somebody."[6] According to CZ, the concept of a formal corporate entity with a headquarters and its own bank account is unnecessary: "All of those things doesn't have to exist for blockchain companies."[7] However, billions of dollars from Binance flowed through dozens of Binance- and CZ-owned U.S.-based bank accounts.[8]

18.  Even though CZ and Binance claim to not have a physical headquarters, much of its infrastructure and many of its employees are located in the United States. A cloud computing platform and applications programming interface ("API") service owned by a technology service provider based in the State of

---

[5] *SEC Compl.* ¶ 27.
[6] *Id.*
[7] *Id.*
[8] *Id.*

Washington hosted the Binance.com website, stored Binance's data, and operated Binance's exchange platform on servers in Japan. Between around July 2017 and October 2022, more than a million U.S. retail users conducted more than 20 million deposit and withdrawal transactions worth more than $550 billion. Upon information and belief, some of those U.S. retail users conducted these transactions in the State of New Jersey. Over this same period, Binance relied upon U.S. trading firms to make markets on the exchange and provide needed liquidity, thereby making various digital assets available to trade by other customers at competitive prices.

19.  A number of key Binance employees reside in the United States. Binance's Vice President of Global Operations, Communications Director, Managing Director of the Binance X Initiative, Senior Vice President of Charity, Senior Manager of User Acquisition, and at least one Risk Management employee all publicize that they reside in California. Binance also issued job listings seeking U.S.-based engineers to work on its blockchain, mobile, and security products, and U.S.-based attorneys to work as in-house legal counsel.

20.  Binance was founded in 2017 and allowed customers, including those in the United States, to make risky, highly leveraged bets on cryptocurrency prices that were and are illegal in the United States—currently offering trading in over 350

crypto assets. In early 2023, Binance was several times the size of the cryptocurrency exchange FTX at its peak, processing tens of billions of dollars in trades each day.[9] As of April 26, 2023, despite customer withdrawals due to regulatory scrutiny, Binance had an estimated $66.5 billion worth of customer holdings.[10] "About two-thirds of all crypto trades take place on Binance's platform, according to CCData, a data analysis firm."[11]

21. Though Binance catered to U.S. customers from its outset, Binance.US was founded in 2019 purportedly to offer a solution for U.S. customers that was compliant with U.S. regulations. However, Binance.com remains highly popular with U.S. customers, who can access it using technology called a Virtual Private Network ("VPN") that makes it seem like the customer's Internet Protocol ("IP") address is associated with another country. According to the U.S. Commodities Futures Trading Commission ("CFTC") in its Consent Orders for Permanent Injunction, Civil Monetary Penalty, and Other Equitable Relief Against Defendants Changpeng Zhao, Binance Holdings Limited, Binance (IE) Limited, and Binance (Services) Holdings Limited ("CFTC Consent Order"), much of Binance's reported trading

---

[9] David Yaffe-Bellany, Emily Flitter & Matthew Goldstein, *Binance Faces Mounting Pressure as U.S. Crypto Crackdown Intensifies*, NEW YORK TIMES, Apr. 26, 2023, https://www.nytimes.com/2023/04/26/technology/binance-crypto-crackdown.html.
[10] *Id.*
[11] *Id.*

volume, and its profitability, has come from its extensive solicitation of and access to customers located in the United States,[12] including, of course, the State of New Jersey.

22.   At all relevant times, and in connection with the matters alleged herein, Defendants were controlled and majority-owned[13] by the same person—founder CZ, "a Chinese-born Canadian citizen [who] most recently has been reported largely splitting his time between Dubai and Paris"[14] - — and constitute a single enterprise with unity of interest. CZ has been an officer and director of BAM and Binance at all relevant times. Between October 2022 and January 2023, CZ personally received $62.5 million from one of the Binance bank accounts.[15]

23.   According to the *SEC Compl.*, which regards the sale of unregistered securities on Defendants' platforms, the ownership structure of Defendants, their platforms, and related entities can be visualized as follows:

---

[12] A true and accurate copy of the Consent Orders are annexed hereto as **"Exhibit D."**
[13] Aidan Ryan, *The People with Power at Binance and Binance.US*, THE INFORMATION, Mar. 17, 2023, https://www.theinformation.com/articles/the-people-with-power-at-binance-and-binance-us.
[14] *See supra* n.3.
[15] SEC Compl. ¶ 30.



24. At all relevant times, and in connection with the matters alleged herein, each Defendant acted as an agent, servant, partner, joint venturer, and/or alter ego of the other, and acted in the course and scope of such agency, partnership, and relationship and/or in furtherance of such joint venture. Each Defendant acted with the knowledge and consent of the other Defendant and/or directed, authorized, affirmed, consented to, ratified, encouraged, approved, adopted, and/or participated in the acts or transactions of the other Defendants as described herein. Recognition of the privilege of separate existence under such circumstances would promote injustice, as described below.

25.  Defendants XYZ CORP. INC. (1-100) and JOHN DOES (1-100) are fictitious parties who conspired to engage in a common scheme to enable cryptocurrency hackers and thieves to launder cryptocurrency through the Binance ecosystem without providing valid or sufficient personal identification and proof of lawful possession of the cryptocurrency, as well as an unknown "Hacker" who owns, maintains and operates a digital cryptocurrency account identified as "0x95f0d3169e8734f300a91Bce591f543F246485Fa" ("Alleged Hacker Account").

## JURISDICTION & VENUE

26.  This Court has original jurisdiction over the subject matter of this action pursuant to 23 U.S.C. § 1331 because Plaintiff's claims arise under the RICO Act, 18 U.S.C. § 1962. The RICO Act provides for nationwide service of process, and Defendants conduct a substantial portion of their business in the United States.

27.  This Court has specific personal jurisdiction over BAM because during the relevant period, BAM sought to become and became licensed by the State of New Jersey Department of Banking & Insurance to conduct the business of a money transmitter under the New Jersey Money Transmitters Act, *N.J.S.A.* 17:15C-1 et seq.[16] N.J.S.A. 17:15C-26.a expressly provides that "Any licensee,

---

[16] See a true and accurate copy of BAM's New Jersey money transmitter license annexed hereto as **"Exhibit E."**

authorized delegate or other person who engages in business activities that are regulated under this act, **with or without filing an application,** is deemed to have done both of the following: (1) **Consented to the jurisdiction of the courts of this State for all actions arising under this act;** and (2) Appointed the commissioner as his lawful agent for the purpose of accepting service of process in any action, suit, or proceeding that may arise under this act" {emphasis added}. Further, BAM advertised on its website that Binance.US was licensed and authorized to serve customers in New Jersey and served numerous customers in New Jersey.

28. Further, this Court has specific personal jurisdiction over Binance because at all relevant times, Binance operated as an unlicensed foreign money transmitter under the New Jersey Money Transmitters Act, *N.J.S.A.* 17:15C-1 <u>et</u> <u>seq.</u> N.J.S.A. 17:15C-26.a expressly provides that "Any licensee, authorized delegate **or other person who engages in business activities that are regulated under this act, with or without filing an application, is deemed to have done both of the following: (1) Consented to the jurisdiction of the courts of this State for all actions arising under this act;** and (2) Appointed the commissioner as his lawful agent for the purpose of accepting service of process in any action, suit, or proceeding that may arise under this act" {emphasis added}.

29.  In  addition,  the  Court  has  specific  personal
jurisdiction over BAM because it (i) transacted business in New
Jersey; (ii) has substantial aggregate contacts with New Jersey;
(iii) engaged in and is engaging in conduct that has and had a
direct,  substantial,  and  reasonably  foreseeable,  and  intended
effect of causing injury to persons in the State of New Jersey;
and (iv) purposely availed itself of the laws of New Jersey.

30.  This  Court  has  specific  personal  jurisdiction  over
Defendants  Binance  and  CZ  because  this  Court  has  specific
personal jurisdiction over BAM, and Defendants Binance and CZ
asserted substantial control over BAM and were alter egos of BAM,
as more fully discussed below.

31.  This  Court  also  has  nationwide  jurisdiction  over
Defendants Binance and CZ based on their contacts with a U.S.-
wide forum under Laurel Gardens, LLC v. Mckenna, 948 F.3d 105
(3d Cir. 2020), and this Court's specific personal jurisdiction
over BAM. Exercising jurisdiction over Defendants in this forum
is reasonable, comports with fair play and substantial justice,
and the ends of justice require Binance's and CZ's presence in
the forum.

32.  Venue is proper pursuant to 28 U.S.C. § 1391 because
BAM is subject to the Court's personal jurisdiction, and Binance
and CZ as defendants not resident in the United States may be
sued in any judicial district. See id. § 1391(c)(3).

18

**_BAM and Binance are Alter Egos, and CZ Controlled Both of Them_**

33. Plaintiff is informed and believes, based on information available in the public domain, that all relevant times, BAM's and Binance's operations were both controlled entirely by CZ, and the entities' operations and funds were comingled to such an extent that it would be inequitable to recognize their existence as separate entities.

34. Binance created BAM in 2019 "as a _de facto_ subsidiary in order to draw the scrutiny of U.S. regulators away from the global exchange."[17]

35. On October 29, 2020, _Forbes_ broke the story about BAM's real purpose:

> The 2018 document details plans for a yet-unnamed U.S. company dubbed the "Tai Chi entity," in an allusion to the Chinese martial art whose approach is built around the principle of "yield and overcome," or using an opponent's own weight against him. While Binance appears to have gone out of its way to submit to U.S. regulations by establishing a compliant subsidiary, Binance.US, an ulterior motive is now apparent. Unlike its creator Binance, Binance.US, which is open to American investors, does not allow highly leveraged crypto-derivatives trading, which is regulated in the U.S.
>
> The leaked Tai Chi document, a slideshow believed to have been seen by senior Binance executives, is a strategic plan to execute a bait and switch. While the then- unnamed entity set up operations in the United States to distract regulators with feigned interest in

---

[17] Angus Berwick & Tom Wilson, _Exclusive: Crypto giant Binance moved $400 million from U.S. partner to firm managed by CEO Zhao_, REUTERS, Feb. 16, 2023, https://www.reuters.com/technology/crypto-  giant-binance-moved-400-million-us-partner-firm-managed-by-ceo-zhao-2023-02-16/.

compliance, measures would be put in place to move revenue in the form of licensing fees and more to the parent company, Binance. All the while, potential customers would be taught how to evade geographic restrictions while technological work-arounds were put in place.[18]

36.  According to the *CFTC Complaint*, "Binance personnel, including [CZ], have dictated [BAM's] corporate strategy, launch, and early operations. At [CZ's] direction, [BAM's] marketing and branding has mirrored that of Binance.com. [BAM] has licensed Binance's trademarks to advertise in the United States. [BAM] has also relied on one of Binance's matching engines through a software licensing agreement."[19]

37.  According to the CFTC Complaint, in the first three months of 2021, Binance transferred more than $400 million from BAM to a trading firm managed by CZ (Merit Peak Ltd.), some of which was later sent to the Silvergate Bank account of a Seychelles-incorporated firm called Key Vision Development Limited, which is another entity controlled by CZ:

> The transfers to Merit Peak took place on the bank's proprietary Silvergate Exchange Network (SEN), which Binance.US joined in November 2020 to serve its corporate clients. SEN allows these clients to transfer dollars between their accounts at the bank. Silvergate's investor prospectus says SEN transfers are "push only," which means they must be authorized by the

---

[18] Michael del Castillo, *Leaked "Tai Chi" Document Reveals Binance's Scheme to Evade Bitcoin Regulators*, FORBES, Oct. 29, 2020, https://www.forbes.com/sites/michaeldelcastillo/2020/10/29/leaked-tai-chi-document-reveals-binances-elaborate-scheme-to-evade-bitcoin-regulators/?sh=1a6e28472a92.

[19] *CFTC Compl.* ¶ 81.

account's controller.[20]

38.  Susan Li, a Binance finance executive, had full access to the BAM account at California-based Silvergate Bank,[21] which in May 2023 shut down operations and liquidated its assets.[22]

39.  On June 5, 2023, *Reuters* reported that Binance executive Guangyin Chen was authorized by Silvergate Bank to operate five bank accounts belonging to BAM: "Employees at the affiliate, [BAM], had to ask Chen's team to process payments, even to cover the firm's payroll, company messages show."[23]

40.  Binance makes clear in the "Binance Terms of Use" that its users must agree to what it considers its fiat gateways, including BAM, to be part of the "ecosystem" that defines "Binance." After expressly defining "Binance" to include "fiat gateways" the Terms of Use also explain that the fiat gateways are part of the services Binance provides:

> **Binance Services** refer to various services provided to you by Binance that are based on Internet and/or blockchain technologies and offered via Binance websites, mobile applications, clients and other forms (including new ones enabled by future technological development). Binance Services include but are not limited to such Binance ecosystem components as Digital

---

[20] *Id.*

[21] *Id.*

[22] MacKenzie Sigalos, *Crypto-focused bank Silvergate is shutting operations and liquidating after market meltdown*, CNBC, https://www.cnbc.com/2023/03/08/silvergate-shutting-down-operations-and-liquidating-bank.html (last visited June 5, 2023).

[23] Angus Berwick & Tom Wilson, *Exclusive: Crypto giant Binance controlled "independent" U.S. affiliate's bank accounts*, REUTERS, https://www.reuters.com/technology/crypto-giant-binance-controlled-independent-us-affiliates-bank-accounts-2023-06-05/ (last visited June 5, 2023).

Asset Trading Platforms, the financing sector, Binance
Labs, Binance Academy, Binance Charity, Binance Info,
Binance Launchpad, Binance Research, Binance Chain,
Binance X, Binance Fiat Gateway, existing services
offered by Trust Wallet and novel services to be
provided by Binance. In short, Binance's Terms of Use
inform consumers that a "Binance Fiat Gateway"—one of
which is BAM—is a service provided by Binance.[24]

41.   The CFTC Complaint elaborates on this strategy:

Binance's corporate organizational chart includes over
120 entities incorporated in numerous jurisdictions
around the world. At times, at least certain of those
entities, including Binance Holdings, Binance IE, and
Binance Services have commingled funds, relied on
shared technical infrastructure, and engaged in
activities to collectively advertise and promote the
Binance brand.

Binance's reliance on a maze of corporate entities to
operate the Binance platform is deliberate; it is
designed to obscure the ownership, control, and
location of the Binance platform . . .

Binance is so effective at obfuscating its location and
the identities of its operating companies that it has
even confused its own Chief Strategy Officer. For
example, in September 2022 he was quoted as saying that
"Binance is a Canadian company." The Chief Strategy
Officer's statement was quickly corrected by a Binance
spokesperson, who clarified that Binance is an
"international company."[25]

42.   Binance does not observe corporate formalities. It has

no board of directors but is controlled entirely by CZ at all

times materially herein. *See CFTC Compl.* ¶ 103 ("As part of [an]

audit, the Binance employee who held the title of Money Laundering

Reporting Officer ("MLRO") lamented that she 'need[ed] to write

---

[24] https://www.binance.com/en/terms (last visited June 5, 2023).
[25] *CFTC Compl.* ¶¶ 82-84.

a fake annual MLRO report to Binance board of directors wtf.'
[Chief Compliance Officer Samuel] Lim, who was aware that Binance
did not have a board of directors, nevertheless assured her, 'yea
its fine I can get mgmt. to sign' off on the fake report.'").

43.  It is the same individual, CZ, who manages all aspects
of both Defendants' operations.  *See, e.g.*, *CFTC Compl.* ¶¶ 85-87
("Zhao is ultimately responsible for evaluating the legal and
regulatory risks associated with Binance's business activities,
including those related to the launch of [BAM].").

44.  Defendant CZ micromanages all aspects of Defendants'
operations.  For example, in January 2021, a month in which
Binance earned over $700 million in revenue, CZ personally
approved an approximately $60 expense related to office
furniture.[26] Moreover, Defendant CZ's approval was required for
all BAM expenditures over $30,000 through at least January 30,
2020.[27] BAM regularly sought approval from Defendant CZ and Binance
concerning routine business expenditures including rent,
franchise taxes, legal expenses, Amazon Web Services fees to
host BAM customer data, and even an $11,000 purchase of Binance-
branded hooded sweatshirts.[28]

45.  BAM "employees referred to [CZ's] and Binance's control
of [BAM's] operations as 'shackles' that often prevented [BAM]

---

[26] *Id.* ¶ 85.
[27] *SEC Compl.* ¶ 170.
[28] *Id.*

employees from understanding and freely conducting the business of running and operating the Binance.US Platform—so much so that, by November 2020, [BAM's] then-CEO told Binance's CEO that her 'entire team feels like [it had] been duped into being a puppet.'"[29]

46.  The same day the BAM platform was announced, a consultant for Binance provided Binance with internal guidelines advising that: "On the US launch, it is important to NOT link it to the .COM IP blocking [of U.S. investors]. That would suggest both that Binance is aware of previous violation and that BAM and .COM are alter egos of each other coordinating the work."[30]

47.  Defendant CZ was involved in the hiring of BAM's first CEO, who reported to and was directed by Defendant CZ and the Binance CFO throughout her tenure from June 2019 through about March 2021.[31] She referred to Binance as the "mothership" and provided weekly updates to Defendant CZ and Binance concerning BAM's operations.[32]

48.  At least for a significant period of time after BAM launched, Binance held and controlled BAM data offshore, and at least for much of 2021, BAM employees could not obtain certain real-time trading data for the BAM platform without CZ's personal

---

[29] *Id.* ¶ 7.
[30] *Id.* ¶ 153.
[31] *Id.* ¶ 150.
[32] *Id.* ¶ 154.

approval.[33]

49.    BAM's second CEO testified to SEC staff that the "level
of . . . connection" between Binance and BAM was a "problem" and
that he had concluded that BAM "need[ed] to migrate the
technology to full [BAM] control."[34] As of at least BAM's second
CEO's resignation in August 2021, no such transfer of control
had happened.[35]

50.    According to a June 10, 2023 article on Forbes.com
titled *5 Most Surprising Revelations from the SEC's Binance
Lawsuit*, Brian Books, a former chief executive of Binance.US who
resigned three months after taking the job, said "what became
clear to me at a certain point was CZ was the CEO of BAM Trading,
not me."

51.    Binance required that CZ and/or the Binance Back Office
Manager had signatory authority over BAM bank accounts, according
to the SEC Complaint. Until at least December 2020, the Binance
Back Office Manager was a signatory of BAM's bank accounts. Until
at least July 2021, she was also a signatory on BAM Trading Trust
Company B accounts that contained BAM customers' fiat deposits.

52.    Binance's finance team managed payment of BAM's
expenses, including by executing money transfers between bank
accounts and depositing cash injections from Merit Peak when BAM

---

[33] *Id.* ¶ 158.
[34] *Id.* ¶ 160.
[35] *Id.*

operating funds were low, according to the SEC Complaint. Binance's finance team was even able to make substantial fund transfers without BAM's knowledge, including in June 2020 as to billions of dollars in BAM's own accounts.

53. In addition, at least through December 2022, Binance was the designated custodian for crypto assets deposited, held, traded, and/or accrued on BAM, and could authorize transfer of crypto assets, including between various omnibus wallets, without then need for any authorization from BAM.

54. As of May 2023, CZ still had signatory authority over BAM's account that held BAM's customers' funds.

### *Key Non-Defendants*

55. Samuel Lim is a resident of Singapore and served as Binance's first Chief Compliance Officer ("CCO") from April 2018 to January 2022. Upon information and belief, Lim is "Individual 1" referenced in the DOJ SOF (see below).

56. Yi He is the Chief Marketing Officer ("CMO") of Binance and cofounded Binance along with CZ and Roger Wang (discussed below). In her role as CMO, she oversees "all marketing efforts" and has touted that she increased "Binance's global influence to become a top cryptocurrency exchange." Upon information and belief, she resides in Malta.

57. Roger Wang is the Chief Technology Officer of Binance and co-founded Binance with CZ and He. Upon information and

belief, he resides in Malta.

58.  Individual 1 in the DOJ SOF, whose identity is known to the DOJ and Binance, was Binance's CCO during much of the relevant period in the DOJ SOF. Individual 1 was hired by Binance in April 2018. Binance placed him on administrative leave beginning in or around June 2022. Individual 1's responsibilities included building and directing the compliance protocols and functions for Binance and certain affiliated exchanges offering, among other things, conversion between virtual and fiat currencies.

59.  Individual 2 named in the DOJ SOF, whose identity is known to the DOJ and Binance, worked for Binance from in or around 2018, until in or around 2021. During that period, Individual 2 held the title of chief financial officer.

60.  Individual 3 named in the DOJ SOF, whose identity is known to the DOJ and Binance, co-founded Binance and was one of CZ's close advisors as part of Binance's senior management group.

61.  Individual 4 named in the DOJ SOF, whose identity is known to the DOJ and Binance, co-founded Binance, was part of Binance' senior management group, and was Binance's operations director.

62.  These senior level employees of Binance and BAM were involved in the strategy, decisions, and actions to ensure that bad actors could continue using Binance.com to launder

cryptocurrency.

## COMMON FACTUAL ALLEGATIONS RELATED TO ALL COUNTS

### *Overview of Defendants' Scheme and the Binance Crypto-Wash Enterprise*

63.  Binance launched its cryptocurrency exchange at Binance.com in 2017, where it enabled customers to open accounts and engage in cryptocurrency transactions. When a user opened an account, Binance assigned them a custodial virtual currency wallet – i.e., a wallet in Binance's custody, which enabled the user to conduct various types of transactions on the platform, such as swapping one crypto for another, transferring funds to other Binance accounts, withdrawing crypto out of Binance, and sending the crypto to external virtual currency wallets or fiat bank accounts.

64.  Binance charges fees to customers for engaging in crypto transactions, so the more transactions customers completed the more Binance earned. Binance has a strong monetary incentive to encourage, facilitate, and allow as many transactions on its exchange as possible, even transactions involving stolen cryptocurrency.

65.  Binance grew at a rapid rate after it was founded. By 2018, Binance had become the world's most active cryptocurrency exchange. In October 2019, Binance had reportedly earned more than $1 billion, and according to a post on Binance.com, in 2022

Binance's revenue reached approximately $12 billion, a ten-fold increase from two years earlier.

66.  The amount of fees Binance charged a user varied based on a user's trading volume and higher-volume traders typically paid lower fees per trade. Higher-volume traders also helped provide liquidity on Binance's platform. Generating a large number of trades and being highly liquid is very important for a crypto exchange. A highly liquid market is generally more desirable from the end-user's standpoint because the bid and ask spreads will typically be narrower and larger trades can be conducted more easily. A highly liquid exchange also makes it easier for bad actors to exchange large amounts of stolen crypto.

67.  Until at least August 2021, Binance and its co-conspirators allowed users to open accounts without submitting any KYC information. Instead, users could open accounts simply by providing an email address and a password. Binance required no other information, such as the user's name, citizenship, or location.

68.  Therefore, anonymous users, including bad actors, were able to open accounts, transfer cryptocurrency into Binance, trade that cryptocurrency on Binance's exchange, and withdraw the exchanged cryptocurrency without providing any self-identifying information. Even after Binance announced it would no longer open new accounts without KYC, it permitted existing

customers to continue using Binance without providing that information.

69. As detailed below, since Binance.com conducted a substantial portion of its business in the United States, its practice of permitting users to open accounts, conduct transactions, and withdraw cryptocurrency with just a username and password violated U.S. laws and regulations. Defendants and co-conspirators knew Binance.com was required to, but failed to, implement KYC and AML procedures. Defendants and co-conspirators willfully violated these important U.S. laws and regulations in order to maximize fees and gain market share. Binance.com's failure to implement an effective AML program along with Defendants' prioritization of growth, market share, and profits over compliance with U.S. law, enabled Binance.com to become the largest cryptocurrency exchange in the world.

70. Over time, Binance felt regulatory pressure to make it appear as if Binance.com was complying with U.S. law so Defendants implemented certain changes, such as prohibiting users who appeared to be from the U.S. based on their IP address. These changes were for appearances only because Defendants' goal was for high-value clients to continue using Binance.com in violation of any purported safeguards for regulatory compliance. Defendants, therefore, knew that bad actors were using the Binance.com platform, and not only did they not try to stop them,

but Defendants Binance and CZ actively took steps to assist and encourage high-value clients, including bad actors, to evade policies that would have helped to prevent them from using Binance.com for illicit activities, including laundering stolen cryptocurrency.

71.  Even though a portion of Binance.com's users may have been legitimate, Defendants' conduct turned Binance.com into a magnet and hub for bad actors to use Binance.com to launder stolen cryptocurrency and this portion of Binance's business served as the Binance Crypto-Wash Enterprise. Defendants and co-conspirators knew that Binance's failure to comply with KYC and AML laws and regulations, such as the BSA, enabled bad actors, including criminals, crypto-thieves, and users located in sanctioned jurisdictions, such as Iran, to use the Binance Crypto-Wash Enterprise to launder digital assets so the assets would not be trackable by the authorities.

### *Background on Cryptocurrency Laundering*

72.  A cryptocurrency wallet is an application that functions as a wallet for your cryptocurrency. It is called a wallet because it is used similarly to a wallet you put cash and cards in. Instead of holding these physical items, it stores the passkeys you use to sign for your cryptocurrency transactions and provides the interface that lets you access your crypto on the blockchain, and interacts with protocols, such as

decentralized exchanges ("DEX") and bridges enabling users to send crypto cross different blockchains. When someone sends their cryptocurrency to another wallet on the blockchain or engages with a protocol, such as a DEX or bridge, a permanent record is created on the ledger for the blockchain so all transactions on the blockchain are trackable.

73. Blockchain transactions are inherently immutable and transparent and recorded on digital ledgers distributed across a decentralized network of nodes. These transactions, encompassing details such as sender and recipient addresses, transaction amounts, and timestamps, are permanently recorded, ensuring the integrity and security of the data. If a bad actor removes someone's crypto without their permission from their wallet or a protocol and then transfers the crypto to their own wallet or tries to withdraw the funds as fiat currency to a bank account, the bad actor could potentially be caught because experts can employ tools and services to trace the movement of stolen digital assets, facilitating potential recovery. Therefore, unlike cash or other types of fungible property, cryptocurrency can be tracked after it is removed from the owner's wallet or protocol.

74. A February 1, 2023 article published on a website of crypto-tracing analysis firm Chainalysis.com titled *2022 Biggest Year Ever For Crypto Hacking with $3.8 Billion Stolen, Primarily from DeFi Protocols and by North Korea-linked Attackers,*

discussed the tracking benefits of the blockchain, stating in part:

> When every transaction is recorded in a public ledger, it means that law enforcement always has a trail to follow, even years after the fact, which is invaluable as investigative techniques improve over time. Their growing capabilities, combined with the efforts of agencies like OFAC to cut off hackers' preferred money laundering services from the rest of the crypto ecosystem, means that these hacks will get harder and less fruitful with each passing year.

75.    As such, the laundering of crypto, *i.e.*, the removal of the ability for the stolen cryptocurrency to be tracked on the ledger, is a key part of the theft of cryptocurrency.

76.    The 2022 Crypto Crime Report by Chainalysis highlights the importance of crypto-laundering as part of the overall theft:

> Cybercriminals dealing in cryptocurrency share one common goal: Move their ill-gotten funds to a service where they can be kept safe from the authorities and eventually converted to cash. ***That's why money laundering underpins all other forms of cryptocurrency-based crime. If there's no way to access the funds, there's no incentive to commit crimes involving cryptocurrency in the first place.***

77.    The Binance Crypto-Wash Enterprise provided an effective way for bad actors to steal and launder crypto. Once someone steals crypto stored in a wallet or in a protocol, they would deposit the stolen cryptocurrency into their Binance.com wallet. Next, they would engage in transactions within the exchange, trading the stolen cryptocurrency for other cryptocurrencies or tokens offered on the platform. Once the

33

funds are sufficiently converted, the thief would withdraw them from the exchange, potentially through multiple accounts or wallets, to further complicate tracing efforts. By leveraging the anonymity and liquidity provided by the Binance Crypto-Wash Enterprise, individuals laundered cryptocurrency and evaded detection.

78. Defendants' refusal and failure to follow the law and implement AML and KYC policies and procedures at Binance.com enabled bad actors to launder crypto at Binance.com. Had Binance.com and CZ complied with the law and ensured Binance.com implemented AML and KYC policies, Binance.com would have identified potential crypto laundering transactions on Binance.com and reported them to the authorities and would have prevented the crypto belonging to Plaintiff from being laundered and withdrawn from Binance.com.

79. A key reason for this is because a substantial portion of crypto laundered by bad actors are transferred to Binance.com from crypto wallets previously identified as wallets associated with illicit crypto activities. In fact, a January 18, 2024 Reuters article titled *Illicit crypto addresses received at least $24.2 billion in 2023 – report*, stated: "At least $24.2 billion worth of crypto was sent to illicit crypto wallet addresses in 2023, including addresses identified as sanctioned or linked to terrorist financing and scams," according to crypto research firm

Chainalysis.

80.  At all relevant times, Defendants had access to tools, platforms, and services that would have enabled them to easily identify if crypto was transferred to a Binance.com account from a crypto wallet that had been identified as being associated with illicit activity. According to a March 11, 2022 article on CoinDesk.com titled *How Authorities Track Criminal Crypto Transactions*, blockchain analytic firms like Chainalysis and CipherTrace have created tools that identify wallets associated with illicit activities and that "it is possible to ascertain how many wallets a criminal controls from a single transaction that might've occurred after a hack, rug pull or any type of unlawful cyber activity was perpetrated."

**_Binance Was Subject to Important U.S. Laws and Regulations_**

81.  Once Binance.com began conducting business in the U.S., it became subject to strict regulations aimed at, among other things, creating a protocol for identifying suspicious activity that might indicate potential money laundering operations and other illicit activities by its customers. In addition, Binance.com was required to have procedures in place for reporting illicit activities to relevant authorities.

82.  Specifically, Binance.com was a foreign-located cryptocurrency exchange that did business wholly or in substantial part within the U.S., including by providing services

to a substantial number of U.S. customers. Binance.com was a "money transmitter," which is a type of money services business. 31 C.F.R. § 1010.100(ff). As a cryptocurrency exchange, Binance.com was a money transmitter because it was "[a] person that provides money transmission services," meaning "the acceptance of currency, funds, or other value that substitutes for currency from one person and the transmission of currency, funds, or other value that substitutes for currency to another location or person by any means," including through "an electronic funds transfer network" or "an informal value transfer system." Id. § 1010.100(ff)(5).

83.    Money transmitters, such as Binance.com, were required to register with FinCEN pursuant to 31 U.S.C. § 5330 and 31 C.F.R. § 1022.380 within 180 days of establishment or risk criminal penalties pursuant to 18 U.S.C. § 1960. Binance.com, as a money transmitter, was also required to comply with the BSA, 31 U.S.C. § 5311 et seq., for example, by filing reports of suspicious transactions that occurred in the U.S., 31 U.S.C. § 5318(g), 31 C.F.R. § 1022.320(a), and implementing an effective AML program "that [was] reasonably designed to prevent the money services business from being used to facilitate money laundering and the financing of terrorist activities," 31 C.F.R. § 1022.210.

84.    An AML program was required, at a minimum and within 90 days of the business's establishment, to "[i]ncorporate

policies, procedures, and internal controls reasonably designed to assure compliance" with requirements that an MSB file reports, create and retain records, respond to law enforcement requests, and verify customer identification (KYC requirement). 31 C.F.R. §§ 1022.210(d)(1), (e).

85. Also, Binance.com was a foreign-located cryptocurrency exchange that engaged, in the State of New Jersey, only in the business of the receipt of money for transmission or transmitting money to locations outside of the United States by any and all means, including but not limited to electronic transfer, or otherwise for a fee, commission, or other benefit. Binance.com was a "foreign money transmitter" under New Jersey law. *N.J.S.A.* 17:15C-2. The State of New Jersey recognizes cryptocurrency as "money," which means "a medium of exchange authorized or adopted by the United States or a foreign government as part of its currency and that is customarily used and accepted as a medium of exchange in the country of issuance." Id. The New Jersey Money Transmitters Act provides "No person, other than a person exempt from the provisions of this act pursuant to section 3, shall engage in the business of money transmission without a license as provided in this act." *N.J.S.A.* 17:15C-4.

86. Additionally, IEEPA, 50 U.S.C. § 1701, et seq., authorized the President of the United States to impose economic sanctions on countries, groups, entities, and individuals in

response to any unusual and extraordinary threat to the national
security, foreign policy, or economy of the United States when
the President declared a national emergency with respect to that
threat. Section 1705 provided, in part, that "[i]t shall be
unlawful for a person to violate, attempt to violate, conspire
to violate, or cause a violation of any license, order,
regulation, or prohibition issued [pursuant to IEEPA]." 50 U.S.C.
§ 1705(a).

87.   OFAC administered and enforced economic sanctions
programs established by executive orders issued by the President
pursuant to IEEPA. In particular, OFAC administered and enforced
comprehensive sanctions programs that, with limited exception,
prohibited U.S. persons from engaging in transactions with a
designated county or region, including Iran, the Democratic
People's Republic of Korea ("DPRK" or "North Korea"), Syria, and
the Crimea, Donetsk, and Luhansk regions of Ukraine, among
others.

88.   FinCEN's Final Rule on Customer Due Diligence
Requirements for Financial Institutions require that Binance.com
establish and maintain written policies and procedures for AML
and KYC protocols. Specifically, FinCEN's customer
identification rules require that Binance.com maintain a written
Customer Identification Program appropriate for its size and type
of business that, at a minimum, includes "risk-based procedures

for verifying the identity of each customer" that enable
Binance.com to "form a reasonable belief that it knows the true
identity of each customer." 31 C.F.R. §§ 1020.220(a)(1), (2).

89.    The Bank Secrecy Anti-Money Laundering Manual
promulgated by the Federal Financial Institutions Examination
Council ("FFIEC Manual") also summarizes industry sound practices
and examination procedures for customer due diligence on accounts
that present a higher risk for money laundering and terrorist
financing. The FFIEC Manual sets forth a matrix for identifying
high risk accounts that require enhanced due diligence. Such
accounts include those that have "large and growing customer[s]
base[d] in a wide and diverse geographic area"; or "[a] large
number of noncustomer funds transfer transactions and payable
upon proper identification [] transactions"; and "[f]requent
funds from personal or business accounts to or from higher-risk
jurisdictions, and financial secrecy havens or jurisdictions,"
such as Binance.com's deposit accounts.

90.    Binance was required to comply with heightened due
diligence for its deposit accounts. According to the FFIEC
Manual, ***Binance's due diligence was required to include
assessments to determine the purpose of the account, ascertain
the source and funding of the capital, identify account control
persons and signatories, scrutinize the account holders' business
operations, and obtain adequate explanations for account***

*activities.*

91. Binance.com's general customer due diligence program was required to include protocols to predict the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, and furnish a means for Binance.com to notice unusual or suspicious transactions for each customer.

92. Furthermore, Binance.com's customer due diligence process must be able to identify any of a series of money laundering "red flags" as set forth in the FFIEC Manual, including: (a) frequent involvement of multiple jurisdictions or beneficiaries located in higher-risk offshore financial centers; (b) repetitive or unusual funds transfer activity; (c) funds transfers sent or received from the same person to or from different accounts; (d) unusual funds transfers that occur among related accounts or among accounts that involve the same or related principals; (e) transactions inconsistent with the account holder's business; (f) customer use of a personal account for business purposes; (g) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; and (h) multiple high-value payments or transfers between shell companies without a legitimate business purpose. The due diligence process must also enable Binance.com to take appropriate action once such "red flags" are identified.

93.   As alleged herein, Defendants willfully and flagrantly ignored these important U.S. and New Jersey rules and regulations, which enabled Binance.com to become a central hub of crypto trading for bad actors, including those who sought to utilize the Binance Crypto-Wash Enterprise.

94.   Defendants were aware of the applicable U.S. laws and willfully violated them. For example, CZ stated the following during a June 9, 2019 management meeting:

> [T]here are a bunch of laws in the U.S. that prevent Americans from having any kind of transaction with any terrorist, and then in order to achieve that, if you serve U.S. or U.S. sanctioned countries there are about 28 sanctioned countries in the U.S. you would need to submit all relevant documents for review *[but that is not] very suitable for our company structure to do so. So, we don't want to do that* and it is very simple *if you don't want to do that: you can't have American users.* Honestly it is not reasonable for the U.S. to do this…. [U.S. regulators] can't make a special case for us. We are *already doing a lot of things that are obviously not in line with the United States.*

95.   According to the DOJ SOF, a chat exchange from February 2019 between Individual 1 and certain compliance employees demonstrates Defendants' knowledge that Binance.com's connections to the United States required it to comply with U.S. registration requirements and the BSA. As Individual 1 explained: "it is the activities performed that cause a person to be categorized as an MSB subject to anti-money laundering rules," and "an entity qualifies as an MSB based on activity within the

United States, not the physical presence of one or more of its agents, agencies, branches, or offices in the United States." Individual 1 also noted that "the Internet and other technological advances make it increasingly possible for persons to offer MSB services in the United States from foreign locations" and "FinCEN seeks to ensure that the BSA rules apply to all persons engaging in covered activities within the United States, regardless of physical location."

***Defendants Plead Guilty to Violating U.S. Laws and Regulations and Settle with Regulators***

**DOJ Action**

96. Defendant Binance and CZ each entered into plea agreements to settle claims alleged by the DOJ in the U.S. District Court for the Western District of Washington.

97. On November 21, 2023, Binance entered into a plea agreement with DOJ and agreed to plea guilty to the following criminal charges contained in the Plea Agreement: (i) conspiracy to conduct an unlicensed money transmitting business ("MTB") in violation of 18 U.S.C. §§ 1960(a) and (b)(1)(B), and to fail to maintain an effective AML program, in violation of Title 31, United States Code, Sections 5318(h), 5322, in violation of 18 U.S.C. § 371; (ii) conducting an unlicensed MTB in violation of 18 U.S.C. §§ 1960(a) and (b)(1)(B),and (iii) violation of the IEEPA, in violation of 50 U.S.C. § 1705 and 31 C.F.R. § 560 <u>et</u>

seq. In connection with the settlement, Binance agreed to forfeit $2,510,650,588 and to pay a criminal fine of $1,805,475,575 for a total financial penalty of $4,316,126,163. Additionally, Binance agreed to retain an independent compliance monitor for three years and remediate and enhance its AML and sanctions compliance programs.

98.  On November 21, 2023, CZ entered into a plea agreement with the DOJ and agreed to plea guilty to the failure to maintain an effective AML program in violation of 31 U.S.C. §§ 5319(h), 5322(c), and 5322(e); 18 U.S.C. § 2; and 31 C.F.R. § 1022.210. In connection with his plea, CZ pled guilty to acting willfully and aiding and abetting and causing a MSB to fail to develop, implement, and maintain an effective AML program. CZ agreed to a fine in the amount of $50 million.

99.  In connection with their guilty pleas, Binance and CZ **admit, agree, and stipulate** that the factual allegations set forth in the Plea Agreement and the DOJ SOF **are true and correct, and that the Plea Agreement and DOJ SOF accurately reflect Defendants' criminal conduct.**

100. On November 21, 2023, the DOJ issued a press release titled Binance and CEO Plead Guilty to Federal Charges in $4B Resolution, which discussed Binance's and CZ's guilty pleas, stating in part:

> **"Binance turned a blind eye to its legal obligations**

*in the pursuit of profit. Its willful failures allowed money to flow to terrorists, cybercriminals, and child abusers through its platform,"* said Secretary of the Treasury Janet L. Yellen. "Today's historic penalties and monitorship to ensure compliance with U.S. law and regulations mark a milestone for the virtual currency industry. *Any institution, wherever located, that wants to reap the benefits of the U.S. financial system must also play by its rules that keep us all safe from terrorists, foreign adversaries, and crime or face the consequences."*

\* \* \*

*"Changpeng Zhao made Binance, the company he founded and ran as CEO, into the largest cryptocurrency exchange in the world by targeting U.S. customers, but refused to comply with U.S. law,"* said Acting Assistant Attorney General Nicole M. Argentieri of the Justice Department's Criminal Division."

\* \* \*

*"Binance's activities undermined the foundation of safe and sound financial markets by intentionally avoiding basic, fundamental obligations that apply to exchanges, all the while collecting approximately $1.35 billion in trading fees from U.S. customers,"* said Chairman Rostin Behnam of the Commodity Futures Trading Commission (CFTC).

\* \* \*

In addition, according to court documents, *Zhao, Binance's founder, owner, and CEO, admitted that he understood that Binance served U.S. users and was thus required to register with FinCEN and implement an effective AML program. . .. Zhao told employees it was "better to ask for forgiveness than permission,"* and prioritized Binance's growth over compliance with U.S. law.

101. In connection with his guilty plea, Defendant CZ was

required to step down from his role as CEO and walk away from

the management of Binance. On February 23, 2024, U.S. District Judge Richard A. Jones signed off on Binance's $4.3 billion plea deal on money laundering and bank fraud charges, stating from the bench that the cryptocurrency exchange's criminal violations could not be explained away by mere ignorance and that Binance was motivated by financial gain and a calculated desire to avoid U.S. laws and regulations:

> This really is a case where the ethics of the company was compromised by greed . . . This isn't a question of ignorance and lack of knowledge. It is a question of violation and choice.

**FinCEN and OFAC Settlement**

102. In a press release dated November 21, 2023, it was announced that Binance settled with Treasury, through FinCEN, OFAC, and CI in connection with Binance's violations of the U.S. AML and sanctions laws. According to the Consent Order entered into between FinCEN and Binance, FinCEN determined that Binance willfully violated the BSA and its implementing regulations during the relevant time period with regard to its obligation to register as an MSB, maintain an effective AML program, and report suspicious transactions. [36] Specifically, FinCEN determined that, as of January 10, 2018, Binance was required to register as an MSB with FinCEN and willfully failed to do so in violation of 31 U.S.C. § 5330 and 31 C.F.R. § 1022.380. FinCEN also determined

---

[36] A true and correct copy of the FinCEN Consent Order is annexed hereto as **"Exhibit F."**

that, as of October 12, 2017, Binance was required to develop, implement, and maintain an effective AML program, and willfully failed to do so in violation of 31 U.S.C. § 5318(h)(1) and 31 C.F.R. § 1022.210. Additionally, FinCEN determined that throughout the relevant time period, Binance was required to accurately, and timely, report suspicious transactions to FinCEN, and willfully failed to do so in violation of 31 U.S.C. § 5318(g) and 31 C.F.R. § 1022.320.

103. The FinCEN investigation found that Binance's "willful failure to implement an effective [anti-money laundering] program," as required by the BSA, "directly led to the [Binance] platform being used to process transactions" designed to "launder illicit proceeds" and "stolen funds." FinCEN also found that Binance's "willful failure to report to FinCEN hundreds of thousands of suspicious transactions inhibited law enforcement's ability to disrupt the illicit actors."

104. The November 21, 2023 press release stated in part that FinCEN's settlement agreement assessed a civil money penalty of $3.4 billion, imposed a five-year monitorship, and required significant compliance undertakings, including to ensure Binance's complete exit from the United States. OFAC's settlement agreement assessed a penalty of $968 million and required Binance to abide by a series of robust sanctions compliance obligations, including full cooperation with the monitorship overseen by

FinCEN. To ensure that Binance fulfills the terms of its settlement – including that it does not offer services to U.S. persons – and to ensure that illicit activity is addressed, Treasury will retain access to books, records, and systems of Binance for a period of five years through a monitor. Failure to live up to these obligations could expose Binance to substantial additional penalties, including a $150 million suspended penalty, which would be collected by FinCEN if Binance fails to comply with the terms of the required compliance undertakings and monitorship.

**CFTC**

105. On November 21, 2023, CZ, Binance, and other Binance entities agreed to a proposed consent order with the CFTC, and on January 16, 2024, agreed to an amended consent order, to resolve charges against Binance and CZ for knowingly disregarding provisions of the Commodity Exchange Act ("CEA") to profit from their operation of an illegal digital assets derivative exchange. The consent order required, among other things, that Binance disgorge $1.35 billion in ill-gotten gains and pay a $1.35 billion civil monetary penalty to the CFTC, and that CZ pay a $150 million civil monetary penalty to the CFTC. The CFTC consent order also, among other things, permanently enjoins CZ and Binance from willfully evading the CEA and failing to have adequate KYC compliance protocols among other illegal activities

in the order and must certify that certain remedial measures have been implemented.

106. On December 14, 2023, Samuel Lim also entered into a consent order with the CFTC ("Lim Consent Order").[37] Among other things, Lim consented to his liability for aiding and abetting Binance's failure to implement customer identification programs and failure to implement KYC and AML procedures. In the consent order, Lim agreed to "the use of the Findings of Fact and Conclusions of Law in this Consent Order in this proceeding or any other proceeding brough by the Commission or to which the Commission is a party or claimant, and agrees that they shall be taken as true and correct and be given preclusive effect therein." The Findings of Fact stated, among other things, that:

> Beginning in June 2019, Binance added some **superficial controls and "Know Your Customer" ("KYC") programs to make it appear that Binance would begin restricting U.S. customer access. But, in reality, U.S. customer presence persisted because Defendants Lim, [CZ], and Binance deliberately allowed U.S. Customers to circumvent Binance's superficial controls and purported "KYC program,"** by advising, directing, and assisting Binance employees and customers how to circumvent Binance's controls.

> Further, at various times during the Relevant Period, Binance personnel, often acting at Lim's direction, assisted U.S. VIP customers to create "new" accounts using "new KYC" documentation in order to circumvent Binance's compliance controls.

> ***

---
[37] See "Exhibit D."

Lim and other members of **Binance's senior management** failed to properly supervise Binance's activities during the Relevant Period and **actively facilitated violations of U.S. law**, including by assisting and instructing customers located in the United States to evade the compliance controls Binance purported to implement to prevent an detect violations of U.S. law, by allowing customers that had not submitted proof of their identity and location to trade on the platform in violation of Binance's own Terms of Service, and by directing VIP customers with ultimate beneficial owners, key employees who control trading decisions, trading algorithms, and other assets all located in the United States to open Binance accounts under the name of newly incorporated shell companies to evade Binance's compliance controls.

**SEC Action**

107. On June 5, 2023, the SEC filed a complaint in the United States District Court for the District of Columbia against CZ, Binance, BAM Trading Services, Inc., and BAM Management US Holdings Inc. for violations of the federal securities laws for providing illegal platforms to offer and sell crypto assets securities to U.S. investors, and for operating unregistered broker and clearing services (the "SEC Complaint").

108. The SEC alleges, among other things, that even though CZ and Binance "claimed publicly that [BAM Trading and BAM Management] independently controlled the operation of the Binance.US Platform," behind the scenes, **"[CZ] and Binance were intimately involved in directing BAM Trading's U.S. business operations** and providing and maintaining the crypto asset services of the Binance.US Platform." The SEC Complaint also

alleges, "[a]s a second part of [CZ]'s and Binance's plan to shield themselves from U.S. regulation, they consistently claimed to the public that the Binance.com Platform did not serve U.S. persons, while simultaneously concealing their efforts to ensure that the most valuable U.S. customers continued trading on the platform."

### Binance Encouraged U.S. Users to Use Binance.com and Evade Binance's Own Compliance Controls Through the Use of VPNs and Other Methods

109.  Beginning in or around September 2019, the United States was a "restricted" jurisdiction for Binance.com so users located in the U.S. should not have been permitted to access the platform. To purportedly enforce the restriction, Binance.com implemented IP address-based compliance controls, sometimes referred to as "geofencing," that collected a customer's IP address and compared it to the list of countries Binance.com had purportedly "restricted" from its platform. The geofencing controls implemented by Binance.com, as Defendants intended, were not effective at preventing customers from restricted countries, such as the U.S., from opening accounts and using the Binance.com platform.

110.  In fact, Binance.com provided U.S.-based users with instructions for how to *evade* Binance.com's geofence. One method was through the use of virtual private networks, or "VPNs." To evade geo-location tracking monitors, a customer need only use a

VPN that "spoofs" the user's actual location. Instead of marking his or her IP address with a location in the United States, the Binance.com user employs a VPN so that Binance.com's records will reflect that the user is logging in from a non-U.S. territory supported by Binance.

111. At least as early as April 2019, Binance.com published a guide on the "Binance Academy" section of its website called "A Beginner's Guide to VPNs," which hinted, "you might want to use a VPN to unlock sites that are restricted in your country."

112. One such VPN, specifically promoted by Binance, is PureVPN, which describes the simple process as follows:



113. As PureVPN explains, as long as the location the user chooses through his/her VPN is a non-U.S. country supported by Binance, the user's log-in to Binance will proceed unfettered:



3. Logging In To Binance

Make sure PureVPN is turned on to the country you verified in and one that supports cryptocurrencies or else you might get flagged by Binance and put your funds at risk. If you are in the United States while using Binance, make sure your server is not in a state that has strict crypto regulations.

114. Binance's senior management, including CZ, knew the Binance VPN guide was used to teach U.S. customers to circumvent Binance.com's IP address-based compliance controls. The *CFTC Complaint* has provided copious evidence this was an *explicit strategy* orchestrated by Binance:

> Binance's corporate communications strategy has attempted to publicly portray that Binance has not targeted the United States at the same time Binance executives acknowledge behind closed doors that the opposite is true. For example, on June 9, 2019, around the time Zhao and Binance hatched their secret plot to retain U.S. customers even after the launch of Binance.US, Binance's Chief Financial Officer stated during a meeting with senior management including Zhao:
>
> > [S]ort of, the messaging, I think would develop it as we go along is rather than saying we're blocking the US, is that we're preparing to launch Binance US. So, we would never admit it publicly or privately anywhere that we serve US

> customers in the first place because we don't.
> So, it just so happens we have a website and
> people sign up and we have no control over
> [access by U.S. customers]       [B]ut we will
> never admit that we openly serve US clients.
> That's why the PR messaging piece is very, very
> critical.

Zhao agreed that Binance's "PR messaging" was critical,
explaining in a meeting the next day that "we need to,
we need to finesse the message a little bit      And
the message is never about Binance blocking US users,
because our public stance is we never had any US users.
So, we never targeted the US. We never had US users."
But during the June 9, 2019 meeting, Zhao himself stated
that "20% to 30% of our traffic comes from the US," and
Binance's "July [2019 Financial] Reporting Package,"
which was emailed directly to Zhao, attributes
approximately 22% of Binance's revenue for June 2019
to U.S. customers.
. . .
In a March 2019 chat, Lim explained to his colleagues
that "CZ wants people to have a way to know how to vpn
to use [a Binance functionality] . . . it's a biz
decision." And in an April 2019 conversation between
Binance's Chief Financial Officer and Lim regarding
Zhao's reaction to controls that purported to block
customers attempting to access Binance from U.S.-based
IP addresses, Lim said: "We are actually pretty
explicit about [encouraged VPN use] already – even got
a fking guide. Hence CZ is ok with blocking even usa."[38]

115. Binance senior management, including Lim, have used
other workarounds to indirectly instruct Binance.com customers
to evade Binance's IP address-based compliance controls. For
example, according to the CFTC Complaint, in a July 8, 2019
conversation regarding customers that ought to have been
"restricted" from accessing the Binance platform, Lim explained

---

[38] *CFTC Compl.* ¶¶ 107, 118.

to a subordinate: "they can use vpn but we are not supposed to tell them that... it cannot come from us . . .but we can always inform our friends/third parties to post (not under the umbrella of Binance) hahah."

***Defendants' Failure to Implement KYC and AML Procedures Enabled Bad Actors to Launder Crypto at the Binance Crypto-Wash Enterprise***

116. Even though Binance.com operated in substantial part in the U.S., Binance's KYC and AML protocols, as required by the BSA, were inadequate and essentially nonexistent and failed to come close to industry standards. Defendants' decision to prioritize growth over compliance with U.S. legal requirements meant that it facilitated billions of dollars of cryptocurrency transactions on behalf of its customers without implementing appropriate KYC procedures or conducting adequate transaction monitoring.

117. Thieves laundered stolen cryptocurrency through Binance.com because Binance failed to implement security measures that would confirm its accountholders lawfully possessed the cryptocurrency deposited in Binance.com accounts, including the ones in which Plaintiff's stolen cryptocurrency were deposited.

118. A primary way that Binance.com facilitated transactions by bad actors was by permitting customers to open accounts, trade crypto on its exchange, and withdraw substantial

amounts of cryptocurrency without requiring more than a user's email address and password. Unlike legitimate virtual currency exchanges, Binance.com did not require these users to validate their identity information by providing official identification documents, given that Binance.com does not require an identity at all. Accounts were therefore easily opened anonymously, including by users in the United States and within New Jersey.

119. Binance's practices encouraged cryptocurrency hackers and thieves to steal cryptocurrency and launder it at Binance.com by breaking the cryptocurrency into amounts of 2 BTC or less, depositing it at Binance.com, converting the illegally-obtained asset, and withdrawing it from Binance.com – all without providing identification. As a direct and proximate result of Defendants and co-conspirators failure to comply with KYC and AML rules and regulations, Plaintiff had crypto stolen and laundered at the Binance Crypto-Wash Enterprise.

120. Due in part to Binance's failure to implement KYC and an effective AML program, bad actors used Binance.com's exchange in various ways, including: (i) operating mixing services that obfuscated the source and ownership of cryptocurrency; (ii) transacting illicit proceeds from ransomware variants; and (iii) moving proceeds of darknet market transactions, exchange hacks, and various internet-related scams.

121. For any crypto asset traded on its exchange, Binance

needed individuals or entities to make markets in that cryptocurrency. To attract market makers, Binance rewarded them with "VIP" status, which conferred upon them certain benefits, including discounted transaction fees. Binance assessed a user's VIP status based on their prior 30-day trading volume and the user's holdings in Binance's proprietary token, BNB. The benefits increased in value as did the VIP user's trading volume and value of BNB holdings. VIP users were an important part of Defendant's business model, and a significant number were U.S. users.

122. Binance.com had two "levels" or "tiers" of user accounts. Until in or around August 2021, Binance and its co-conspirators allowed users to open a "Level 1" or "Tier 1" account without submitting any KYC information. Instead, users could open Level 1 accounts simply by providing an email address and a password. Binance required no other information, such as the user's name, citizenship, or location.

123. A Level 1 account holder could deposit virtual currency into their account, and then transact in an unlimited number of virtual currencies. While Level 1 accounts had certain limitations, including a virtual currency withdrawal limit of up to the value of two BTC per day, Binance allowed users to open multiple Level 1 accounts by providing a new email address for each account, which effectively circumvented the withdrawal limit. Even if a user adhered to the daily two BTC withdrawal

limit on a single account for most of Binance's existence, the user could still withdraw thousands – and sometimes tens of thousands – of U.S. dollars in cryptocurrency due to the rising value of a single Bitcoin, which increased in value from approximately $3,000 in December 2018 to $63,000 in April 2021. To access greater withdrawal limits within a single account, users could open a "Level 2" or "Tier 2" account by submitting KYC information, including the user's name, citizenship, residential address, or government issued identification document or number. At all relevant times, Level 1 accounts comprised the vast majority of the user accounts on Binance.com.

124. Defendants had actual knowledge that their KYC and AML policies were inadequate but knowingly kept them in place to drive revenue and profit. Defendants knew that U.S. users, in violation of U.S. law, accessed Binance.com with a VPN and got around KYC by breaking down withdrawals into amounts of up to two BTC per day.

125. According to a chat referenced in the CFTC Complaint, in February 2019, Lim chatted to CZ: "a huge number" of Binance's "TIER 1 could be U.S. citizens in reality. They have to get smarter and VPN through non-U.S. IP." And, according to the CFTC Complaint, CZ stated during a management meeting in June 2019 that the "under 2 BTC users is [sic] a very large portion of our volume, so we don't want to lose that," although he also

understood that due to very clear precedents," Binance's policy allowing "those two BTCs without KYC, this is definitely not possible in the United States."

126. According to a a January 2019 chat referenced in the CFTC Complaint between Lim and a senior member of the compliance team discussing their plan to "clean up" the presence of U.S. customers on Binance, Lim explained: ***"Cz doesn't wanna do us kyc on .com."*** And Lim acknowledged in February 2020 that Binance had a financial incentive to avoid subjecting customers to meaningful KYC procedures, as ***Zhao believed that if Binance's compliance controls were "too stringent" then "[n]o users will come."***[39]

127. According to the CFTC Complaint, in an October 2020 chat between Lim and a Binance colleague, Lim explained:

> [Because you attended a telephone conference on which CZ participated] then you will also know that as a company, we are probably not going to remove no kyc (email registration) because its too painful . . . i think cz understands that there is risk in doing so, but I believe this is something which concerns our firm and its survivability. If Binance forces mandatory KYC, then [competing digital asset exchanges] will be VERY VERY happy.[40]

128. Defendants Binance and CZ admit in their DOJ Plea Agreements that due to Binance's "willful failure to implement an effective AML program, [Binance] processed transactions by users who operated illicit mixing services and laundered proceeds

---

[39] *CFTC Compl.* ¶ 100.
[40] *Id.* ¶ 96.

of darknet market transactions, hacks, ransomware, and scams."

129. Instead of preventing bad actors from using Binance.com as required under U.S. law, Defendants took steps to ensure bad actors had access to the Binance Crypto-Wash Enterprise by turning a blind eye to the wide variety of money and cryptocurrency laundering they knowingly facilitated through Binance.com. As of May 2022, Binance had not filed a single Suspicious Activity Report ("SAR") in the United States. According to the FinCEN Consent Order, however, "FinCEN identified well over a hundred thousand suspicious transactions that Binance failed to timely and accurately report to FinCEN." In fact, according to the FinCEN Consent Order, Binance's former CCO "reported to other Binance personnel that the senior management policy was to never report any suspicious transactions."

130. The unreported suspicious transactions fall into several categories, including ransomware, terrorist financing, high-risk jurisdictions, darknet markets and scams. Ransomware is malicious software that restricts the victim's access to a computer in exchange for a specified ransom, usually paid in Bitcoin. If the specified ransom is not paid, the victim may be threatened with the loss or exposure of their personal data, including personally identifiable information ("PII"), such as account numbers and social security numbers. According to the

FinCEN Consent Order: "**[s]ome ransomware operators, including those located in Iran and North Korea, have purposefully targeted U.S. hospitals, schools, and other vital public services;**" "**Binance reportedly became one of the large receivers of ransomware proceeds;**" and "**Binance was aware of the significant uptick in ransomware activity as early as February 2019.**" And even though "Binance was aware of many specific movements of ransomware proceeds through the platform," Binance failed to file SARs with FinCEN, according to the FinCEN Consent Order.

131. **The FinCEN Consent Order lists numerous suspicious transactions involving tens of millions of dollars**, which Binance ignored and failed to file SARs. According to the FinCEN Consent Order, "Binance addresses transacted directly with CVC [convertible virtual currency – the preferred payment method of ransomware perpetrators] obtained via attacks associated with at least 24 different unique strains of ransomware, including: Bitpaymer, Cerber, Cryptolocker, CryptoWall, CrySIS-Dharma, Erebus, Hermes, Locky, NetWalker, NotPetra, Nozelesn, Phobos, Popotic, Ryuk, SamSam, Satan, Snatch, Sodinokibi, Spora, TorrentLocker, and both strains of WannaCry."

132. In 2019, even though **Binance.com deposit addresses were directly linked to millions of dollars' worth of Nozelesn ransomware proceeds**, "Binance's former Chief Compliance Officer instructed his team to take no action as the addresses were

associated with a high-value client who had indirect exposure to a darknet market." And when Binance was notified by law enforcement of suspicious activity, it often resisted cooperating and demanded indemnification before proving any reporting.

133. Binance's lack of KYC and AML procedures also enabled numerous terrorist organizations to benefit from Binance's platform. According to the FinCEN Consent Order, "Binance user addresses were found to interact with bitcoin wallets associated with the Islamic State of Iraq and Syria (ISIS), Hamas' Al-Qassam Brigades, Al Qaeda, and the Palestine Islamic Jihad (PIJ)."

134. According to the FinCEN Consent Order, Binance had significant, ongoing exposure to Russian illicit finance, including:

> (i) processing hundreds of millions of dollars in transactions for a CVC exchange co-owned by a Russian citizen who pled guilty to money laundering in February 2023, including transactions effected after this individual's guilty plea; (ii) processing several million dollars for a CVC exchange that allowed its users to "cash out" at a Russian bank designated by OFAC and that had substantial exposure to the Russian darknet market Hydra Market; and (iii) as recently as the summer of 2023, continuing to effect transactions with the darknet market Russia Market, one of the largest cybercrime service websites in the world.

135. Between August 2017 and April 2022, there were direct transfers of approximately **$106 million** in bitcoin to Binance.com wallets **from Hydra**, a popular Russian darknet marketplace frequently utilized by criminals that facilitated the sale of

illegal goods and services. These transfers occurred over time to a relatively small number of unique addresses, which indicates "cash out" activity by a repeat Hydra user, such as a vendor selling illicit goods or services.

136. From February 2018 to May 2019, Binance processed more than *$275 million* in deposits and more than *$273 million* in withdrawals *from BestMixer* – one of the largest cryptocurrency mixers in the world until it was shut down by Dutch authorities in May 2019.

137. According to the CFTC Complaint, in February 2019, after receiving information *"regarding HAMAS transactions"* on *Binance*, Lim explained to a colleague that terrorists usually send "small sums" as "large sums constitute money laundering." Lim's colleague replied: "can barely buy an AK47 with 600 bucks."[41] And referring to certain Binance customers, including customers from Russia, Lim acknowledged in a February 2020 chat: *"Like come on. They are here for crime."* Binance's Money Laundering Reporting Officer agreed that *"we see the bad, but we close 2 eyes."*[42]

138. Even when illicit actors or high-risk users were identified in certain instances, Defendants allowed those individuals to continue to access the platform – particularly if

---

[41] *Id.* ¶ 104.
[42] *Id.*

they were VIP users. Defendant CZ was against getting rid of users who were affiliated with illegal activities and if an account was identified as being suspicious, his preferred method of handling the situation was for the user to create a new account. For example, Defendants Binance and CZ admit in their DOJ plea agreements to the following from the DOJ SOF:

      a. In July 2020, Binance's chief compliance officer ("Individual 1" or "Binance's CCO") and others discussed a VIP user who was off boarded after being publicly identified as among the "top contributors to illicit activity." Individual 1 wrote that, as a general matter, Binance's compliance and investigation teams should check a user's VIP level before off boarding them, and then Binance.com could "give them a new account (if they are important/VIP)" with the instructions "not to go through XXX channel again;" and

      b. In another conversation, Binance's CCO referenced Hydra. With resect to the same specific VIP user, Binance's CCO wrote, "[c]an let him know to be careful with his flow of funds, especially from darknet like hydra... [h]e can come back with a new account. . . [b]ut this current one has to go, its tainted."

139. According to the CFTC Complaint, Lim's instruction to a Binance employee to allow a customer "very closely associated with illicit activity" to open up a new account and continue trading on the platform is consistent with CZ's business strategy, which has counseled against off-boarding customers even if they presented regulatory risk. The CFTC Complaint cited a September 2020 chat where Lim explained to Binance employees that they "Don't need to be so strict" and "Offboarding = bad in cz's eyes."

140. According to the FinCEN Consent Order, "Binance also received substantial proceeds from the September 2018 hack of the Zaif exchange by facilitating hundreds of transactions involving stolen funds. Binance acknowledged that CVC wallet addresses on Binance were used to launder 1,451.7 bitcoin (over $9.5 million) from the hack, which was broken into 1.99-2 (over $13,000) bitcoin transactions." According to the FinCEN Consent Order, "A senior Binance manager recommended against closing these accounts, stating, 'I think there is no meaning to take more effort to these addresses. It's a type of standard money laundering...'"

141. According to the CFTC Complaint, Lim has displayed a nuanced understanding of applicable regulatory requirements and the potential individual liability that may accompany a failure to comply with U.S. law. For example, in October 2020 Lim chatted

to a colleague:

> US users = CFTC = civil case can pay fine and settle
> no kyc = BSA act [sic] = criminal case have to go [to] jail[43]

### *In Violation of U.S. Law, Binance.com Permitted Transactions from Anonymous Users in the United States and by Users From Sanctioned Jurisdictions*

142. A substantial amount of cryptocurrency theft is perpetrated by users located in sanctioned nations and Defendants were aware that Binance.com had a significant customer base from comprehensively sanctioned jurisdictions from its inception. For example, according to a February 1, 2023 report on Chainalysis.com titled *2022 Biggest Year Ever For Crypto Hacking with $3.8 Billion Stolen, Primarily from DeFi Protocols and by North Korea-lined Attackers*, in 2022, "North Korea-linked hackers such as those in cybercriminal syndicate Lazarus Group" stole "an estimated $1.7 billion worth of cryptocurrency across several hacks." Additionally, individuals and groups based in Russia, some of whom have been sanctioned by the United States, "account for a disproportionate share of activity in several forums of cryptocurrency-based crime," according to the 2022 Crypto Crime Report by Chainalysis. According to that report, approximately $400 million in crypto illegally obtained through ransomware in 2021 was affiliated with Russia.

143. Nevertheless, Defendants refused to implement policies

---

[43] *Id.* ¶ 112.

required under U.S. law in order to prevent bad actors from sanctioned nations from using Binance.com's platform. Since a substantial amount of cryptocurrency theft is perpetrated by individuals located in sanctioned jurisdictions, Defendants' failure to restrict those transactions proximately caused the laundering of stolen crypto at the Binance Crypto-Wash Enterprise.

144. Defendants knew that U.S. law prohibited U.S. persons from conducting certain financial transactions with countries, groups, entities, or persons sanctioned by the U.S. government. Defendants knew that Binance.com serviced users from these comprehensively sanctioned jurisdictions and that these users were prohibited from conducting transactions with U.S. persons. Defendants further knew that Binance.com's matching engine, which matched customer bids and offers to execute cryptocurrency trades, had been designed to execute cryptocurrency trades based on price and time without regard to whether the matched customers were prohibited by law from transacting with one another.

145. Defendants knew that Binance.com did not block transactions between users subject to U.S. sanctions and U.S. users and that its matching engine would necessarily cause such transactions, in violation of U.S. law. Nevertheless, Defendants did not implement the necessary controls that would have prevented Binance.com from causing U.S. users to conduct

cryptocurrency transactions with users in comprehensively sanctioned jurisdictions. Accordingly, Defendant CZ and others knew that Binance.com would violate U.S. law by matching U.S. users with users in comprehensively sanctioned jurisdictions, but it did not implement effective controls to prevent such sanctions violations from occurring.

146. According to the DOJ SOF, Individual 1 was aware of developments in the U.S. sanctions laws through regular email updates regarding U.S. sanctions from OFAC and other third parties. Individual 1 disseminated some of this information about U.S. sanctions to colleagues and senior leaders, including CZ.

147. According to the DOJ SOF, in an October 2018 chat, Individual 1 sent a message to CZ about the sanctions risk to Binance.com's business and the need to develop a sanctions strategy: "Cz I know it's a pain in the ass but its [sic] my duty to constantly remind you . . . [a]re we going to proceed to block sanctioned countries ip addresses ([as] we currently have users from sanction countries on [Binance].com[.]" Individual 1 continued to note, "[d]ownside risk is if fincen or ofac has concrete evidence we have sanction [sic] users, they might try to investigate or blow it up on worldstage." While CZ responded "yes, let's do it," CZ and Binance senior management knew that IP address blocks could be circumvented by users accessing Binance through a VPN. Binance did not, in any event, block IP

addresses of sanctioned countries at that time.

148. CZ and Binance senior leaders understood that Binance.com risked violating sanctions laws. For example, CZ stated during a June 9, 2019 management meeting:

> [T]here are a bunch of laws in the U.S. that prevent Americans from having any kind of transaction with any terrorist, and then in order to achieve that, if you serve
> U.S. or U.S. sanctioned countries there are about 28 sanctioned countries in the U.S. you would need to submit all relevant documents for review [but that is not] very suitable for our company structure to do so. So, we don't want to do that and it is very simple if you don't want to do that: you can't have American users. Honestly it is not reasonable for the U.S. to do this.
> . . . .
> [U.S. regulators] can't make a special case for us. We are already doing a lot of things that are obviously not in line with the United States.[44]

149. Knowing the risk of violating U.S. sanctions, CZ authorized a remediation of Binance.com's sanctions risk between late 2018 and early 2019, whereby Binance.com's compliance team would identify users from comprehensively sanctioned jurisdictions and work with Binance's operations team to implement controls to prevent those users from accessing the platform. However, as Defendants Binance and CZ admit in the DOJ Plea Agreements, Defendants refused to devote sufficient resources to the remediation effort so Binance.com continued to permit users from sanctioned jurisdictions.

---

[44] *Id.* ¶ 113.

150. According to the DOJ SOF, Individual 1 explained the goal of the remediation was to "ensure OFAC compliance" and "ensure we have documented records and steps taken should we be approached by various regulators." However, senior Binance leaders including CZ and Individual 4 (Binance's operations director and member of senior management) knew that the remedial measures Binance.com purported to implement, such as limited KYC and IP blocking, would be ineffective, since most users at that time provided Binance.com with limited KYC information, and users could easily access Binance's platform by using VPN's to change their IP addresses to an address associated with a country that was not comprehensively sanctioned.

151. Despite Binance.com's purported remediation in 2018 and 2019, users in the United States and from comprehensively sanctioned countries continued to access Binance.com and Binance's matching engine continued to cause transactions between U.S. persons and users in comprehensively sanctioned jurisdictions, in violation of U.S. law.

152. In November 2019, about a year after Binance.com claimed it had begun to block users in comprehensively sanctioned jurisdiction, an FBI inquiry caused Binance.com to identify approximately 600 "verified level 2" users from Iran.

153. According to Defendants' own data detailed in the DOJ SOF, between August 2017 and October 2022, Binance caused

millions of dollars of transactions between U.S. users and users in other comprehensively sanctioned jurisdictions, including Cuba, Syria, and the Ukrainian regions of Crimea, Donetsk, and Luhansk. Defendants profited from the transactions that it caused in violation of IEEPA and various U.S. sanctions regimes.

154. According to the settlement agreement between Binance and OFAC, Binance.com permitted at least 1,667,153 virtual currency transactions valued at approximately $706,068,127 in apparent violation of U.S. sanctions programs for Iran, Syria, North Korea, the Crimea Region of Ukraine, and Cuba.

155. Had Defendants implemented sufficient controls to prevent U.S. users from transacting with users in comprehensively sanctioned jurisdictions, it could have prevented Binance.com's matching engine from causing those users to transact on Binance.com's platform.

**_Binance Created Binance.US to Distract Regulators so Binance.com Could Continue Doing "Business as Usual" with U.S. Customers and Bad Actors_**

156. Defendants knew Binance.com's substantial U.S. user base required it to register with FinCEN and comply with the BSA. Rather than registering with FinCEN and complying with the BSA, in furtherance of the Binance Crypto-Wash Enterprise, Defendants established Binance.US as a U.S.-based exchange in 2019, which would register with FinCEN and conduct KYC, and purportedly be targeted for Binance's U.S. users. Binance.US registered as an

MSB with FinCEN in or around June 2019, and became licensed as a New Jersey money transmitter (Ex. B to Compl.). Binance.US was wholly owned by CZ through the legal entity BAM Trading Services, Inc.

157. In reality, a primary purpose of Binance.US was to enable Binance.com to continue evading U.S. legal and regulatory requirements and reduce regulatory pressure on Binance.com. Even though Binance blocked some U.S. users who did not use a VPN on Binance.com and redirected them to Binance.US, Defendants continued to allow U.S.-based users to use Binance.com with a VPM and took steps to ensure that some of the largest U.S. users remained on the Binance.com platform.

158. CZ, who controlled the operations of Binance.US, kept information reflecting Binance.US's customer base secret even from certain senior managers and has been cautious in circulating internal materials to a broad audience. According to the CFTC Complaint, in a March 2019 discussion regarding the circulation of data that categorized Binance users by geographic location, CZ said, "Let me see it first then, and not distribute it, especially guys who have to deal with U.S. regulators."[45]  And in an August 2020 chat referenced in the CFTC Complaint, CZ instructed a Binance employee that transaction volume data

---

[45] *Id.* ¶ 114.

concerning U.S. [Application Program Interface] customers should not be published to a group; rather, such data should be sent only to CZ.[46]

159. The idea for the creation of Binance.US as a distraction for U.S. regulators was proposed in late 2018 when Binance engaged a consultant for managing its risk related to U.S. law enforcement. The consultant outlined various aspects of Binance's exposure to U.S. laws, including federal MSB registration, BSA compliance, AML policies and procedures, sanctions laws, and state money transmitting licensing, among other legal and regulatory requirements. The consultant proposed various avenues through which Defendants could mitigate Binance's regulatory exposure, ranging from the "low-risk" option of fully complying with U.S. laws, the "moderate-risk" option of establishing a formal U.S. presence subject to U.S. laws that would absorb U.S. regulatory scrutiny, and the "high-risk" option of maintaining the status quo, whereby Binance would continue to operate in the U.S. without taking steps to comply with U.S. laws. The consultant further provided guidance for Defendants to pursue the "moderate-risk" option: establishing a U.S. entity, indirectly controlled by Binance, which would become the focus of U.S. law enforcement and regulatory authorities and allow

---

[46] *Id.*

Binance to continue to profit from the U.S. market.

160. Although Defendants did not adopt the consultant's recommendations as offered, Binance's senior leaders decided to create and launch a U.S.-based exchange that would register with FinCEN and conduct KYC on all users. Defendants' "retail" users would, gradually, be directed to move from Binance.com to the new U.S.-based exchange. But Defendants would develop and execute various strategies to allow some high volume, VIP U.S. users to continue to access Binance.com. Importantly, any user that desired to continue using Binance.com needed only a VPN to do so.

161. According to the DOJ SOF, in February 2019, CZ established "U.S. Exchange and Main Exchange – Compliance [P]arameters" within which Binance would allow U.S. users from U.S.-located IP addresses with non-U.S. KYC information to continue to access Binance.com through an API. A senior manager advised CZ that "U.S. legal" had identified a strategy "to allow the US big traders to be able [] to trade via API on the main site, but not everyone." CZ proposed that these U.S. users could "remain on main exchange [Binance] or move over to US exchange. However if they want to move over to US exchange, they have to perform US KYC."

162. In or around June 2019, Binance publicly announced that it would block U.S. users from Binance.com and launch a separate

U.S. exchange. According to the DOJ SOF, CZ and Individuals 1 and 2 helped launch the new U.S. exchange, including registering as an MSB with FinCEN and obtaining state money transmitting licenses ("MTLs"). Individual 2 reported to Binance's other senior leaders regarding the status of the entity's MSB registration and MTLs, which they understood the new entity would need to operate lawfully in the United States.

163. As described above and detailed in the DOJ SOF, although Binance announced it would block U.S. users and establish a separate exchange that would serve the U.S. market, Binance retained a substantial portion of its U.S. user base on Binance.com, with a particular focus on the largest U.S.-based VIPs, including the trading firms that made markets on Binance.com. On or about June 3, 2019, CZ sought and requested information regarding the number of U.S. VIPs on Binance.com as identified by KYC, and his assistant informed him that Binance.com had more than 1,100 U.S. KYC VIP users. On a June 9, 2019 recorded call among senior Binance leaders, including CZ, Individual 3 stated that Binance had more than 3,500 VIPs from the United States, based on KYC and IP address information, and the total number of U.S. and non-U.S. VIP and enterprise users accounted for more than 70% of Binance.com's revenue. On a June 25, 2019 call among senior leaders, Individual 3 further noted that Binance's approximately 11,000 VIPs accounted for more than

70% of its trading revenue. Of that 70% of trading revenue, U.S. VIPs accounted for about one-third.

164. According to the DOJ SOF, rather than lose high-volume U.S. VIP users, Binance employees, acting on instruction from Binance's senior leaders, including CZ and Individuals 1, 3, and 4, encouraged such users to conceal and obfuscate their U.S. connections, including by creating new accounts and submitting non-U.S. KYC information in connection with those accounts. Senior Binance leaders discussed this strategy on internet-based calls in or around June 2019.

165. For example, during a June 25, 2019 call alleged in the DOJ SOF, including, among others, CZ and Individuals 1, 3, and 4, the participants discussed and agreed to strategies to keep U.S. VIPs on Binance.com and, as CZ noted, to "achieve a reduction in our own losses and, at the same time, to be able to have U.S. supervision agencies not cause us any troubles" and to achieve the "goal" of having "US users slowly turn into [sic] other users." CZ acknowledged that Binance "cannot say this publicly, of course."

166. As alleged in the DOJ SOF, during the same call on or around June 25, 2019, Binance employees and executives, including Individuals 3 and 4, told CZ that they were implementing the plan by contacting U.S. VIP users "offline," through direct phone calls, "leav[ing] no trace." If a U.S. VIP user owned or

controlled an offshore entity, i.e., located outside of the United States, Binance's VIP team would help the VIP user register a new, separate account for the offshore entity and transfer the user's VIP benefits to that account, while the user transferred their holdings to the new account. As Binance's VIP manager acknowledged, however, some of these offshore entities were owned by U.S. persons. On the same call on or around June 25, 2019, Individual 3 described a script that Binance employes could use in communications with U.S. VIPs to encourage them to provide non-U.S. KYC information to Binance by falsely suggesting that the user was "misidentified" in Binance's records as a U.S. customer. CZ authorized and directed this strategy, explaining on the call, "[W]e cannot say they are U.S. users and we want to help them. We say we mis-categorized them as U.S. users, but actually they are not."

167. Also during the call on or around June 25, 2019, Individual 1 provided guidance on what Binance should not do: "We cannot advise our users to change their KYC. That's, that's of course against the law." Individual 1 provided an alternative route to the same end: "But what we can tell them is through our internal monitoring, we realize that your account exhibits qualities which make us believe it is a US account. . . if you think we made a wrong judgment, please do the following, you know, and we have a dedicated customer service VIP service

officer." Individual 1 described Defendants' plan as "international circumvention of KYC."

168. According to the DOJ SOF, Defendants agreed to and implemented this strategy to keep U.S. VIP users on Binance.com as documented in an internal document titled "VIP handling." Document metadata reflects that the "VIP handling" document was last modified by Individual 1 on June 27, 2019.

169. The "VIP handling" document provided templates for messages that employees would send to U.S. users "in batches . . . as recommended by CZ" describing the impending and purported block of U.S. users from Binance.com and launch of Binance.US. The document also provided scripts for Binance representatives to use in follow-up communications by phone or through an encrypted internet-based messaging service to help U.S. users continue to access Binance.com despite the purported block.

170. For VIP users that had submitted U.S. KYC documents, the "VIP handling" document instructed Binance representatives to, among other things, "[m]ake sure the user has completed his/her new account creation with no US documents allowed," and to "[m]ake sure to inform user to keep this confidential." The document further instructed representatives: "We cannot tell users in any way we are changing their KYC, this is not compliant. We are basically correcting previously inaccurate records in light of new evidence."

171. For VIP users that had not submitted KYC information and were blocked due to accessing Binance via a U.S. IP address, the "VIP handling" document **instructed Binance representatives to surreptitiously counsel the user to hide their U.S. location** by, among other things, "[i]nform the user that the reason why he/she cant [sic] use our [Binance.com url] is because his/her IP is detected as US IP [sic]," and **"[i]f the user doesn't get the hint, indicate that IP is the sole reason why he/she can't use.com."** The document further instructed representatives not to "[e]xplicitly instruct user to use different IP. We cannot teach users how to circumvent controls. If they figure it out on their own, its [sic] fine."

172. Through these strategies, including after Binance.US went live in September 2019, Binance maintained a substantial number of U.S. users on Binance.com, including U.S.-based VIP users and bad actors, that at times conducted virtual currency transactions equivalent to billions of U.S. dollars per day, helping provide the liquidity necessary for Binance.com.

173. Defendants' strategy of launching Binance.US to enable Binance.com to continue doing business in the U.S. was successful. By September 2020, Binance.com attributed approximately 16% of its total registered user base to the United States, more than any other country on Binance.com, according to an internal monthly report that listed the approximate number

and percentage of registered users by country. The following month, Binance.com removed the United States label from this report and recategorized U.S. users with the label "UNKWN." In October 2020, according to the internal monthly report, "UNKWN" users represented approximately 17% of Binance.com's registered user base.

174. According to Binance.com's own transaction data, U.S. users conducted trillions of dollars in transactions on the platform between August 201 and October 2022 alone, generating approximately $1,612,031,763 in profit for Binance.

**_Mr. Gonzalez Suffered Financial Harm from the Binance Crypto-Wash Enterprise_**.

175. As a result of Binance's conduct and systemic failures to require KYC and implement AML, Mr. Gonzalez has been damaged.

176. On or about May 3, 2021, Mr. Gonzalez contacted Coinbase customer service to advise of a problem with his Account bearing digital address 0x0E6eC53Eb9742b98a865571bd25e3c6daA4c8Dac ("Dac").

177. Specifically, Mr. Gonzalez could not access his account at U.S.-based cryptocurrency exchange Coinbase to withdraw money.

178. Mr. Gonzalez was assigned a Coinbase Specialist who was investigating his account problem.

179. On or about May 8, 2021, Mr. Gonzalez was finally able to access his account, but was unable to trade because the

Coinbase platform warned of a "lack of liquidity," when the screen showed that Mr. Gonzalez possessed more than ample liquidity to trade.

180. Expert cryptographic tracers concluded that Mr. Gonzalez's Coinbase Account, bearing an account number ending in "Dac" (hereinafter referred to as "Account 1") was hacked and approximately 41,881,332,772 units of Shiba Inu (SHIB), 90,934,964,476,560.50 units of Hokkaidu Inu (HOKK), 6,677,846,866,673.65 units of Kishu Inu (KISHU), 1,985,208,578.34 units of Akita Inu (AKITA), 1,382,788,310,243.34 units of FEG Token (FEG), 53,436.64 units of Hydro (HYDRO), 123.3706939 units of Paid Network (PAID), 578.2658609 units of DigiCol Token (DGCL), and other cryptocurrencies respectively, were improperly and unlawfully transferred out of Plaintiff's account to the Alleged Hacker Account with the following address: 0x95f0d3169e8734f300a91Bce591f543F246485Fa ("Wallet A1"), then laundered primarily through asset hopping, using the Uniswap and MetaMask Decentralized Exchanges, arriving in Binance Account 0xcf7ec8a9d0ac78434389f1473a92d9b9a14fecb ("Wallet B3" or "Binance") where the funds appeared to be cashed out to a Binance Hot Wallet:



181. All the transfers of Plaintiff's cryptocurrency portfolio to Binance were within Binance's 2 BTC limit under which no form of identification was required to deposit cryptocurrency.

182. The public nature of blockchain is why Plaintiff was able to determine, following a thorough investigation tracing the block chain, that a hacker had deposited his cryptocurrency with Defendants.[47]

---

[47] See **"Exhibit A."**

183. Upon information and belief, at least some of the assets at issue that were stolen from Plaintiff are still housed at Binance.

184. Upon information and belief, the anonymous hacker continued to access Plaintiff's Coinbase wallet and steal other cryptocurrencies, including as recently as August 2024.

185. Plaintiff has made numerous demands that Defendants return his cryptocurrency to no avail.

186. Upon information and belief, between May 8, 2021 and the date of this filing, the total value of the cryptocurrencies stolen from Plaintiff fluctuated, but is believed to have been valued, at the portfolio's high at over $3 trillion.

187. As a direct and proximate result of Binance's violations of the law and failures described herein, Plaintiff suffered financial harm when his digital assets were stolen and laundered through Binance.com.

**RICO Allegations**

188. Defendants engaged in a fraudulent scheme, common course of conduct and conspiracy to gain market share and generate revenues for Binance by enabling bad actors to launder stolen cryptocurrency through Binance.com.

189. To achieve these goals, Defendants set up and managed the Binance Platform, including Binance.com and Binance.US, in a manner that willfully violated U.S. laws and regulations

requiring adequate KYC or AML policies so that bad actors and U.S. sanctioned entities could create accounts, engage in cryptocurrency transactions, and deposit and withdraw cryptocurrency. As a direct result of their conspiracy and fraudulent scheme, Defendants generated massive amounts of fees and bad actors laundered cryptocurrency through the Binance Platform which was taken from Plaintiff as a result of hacks, ransomware, and theft.

**The Binance Crypto-Wash Enterprise**

190. Binance was formed in 2017 and since that time has operated cryptocurrency trading platforms, including the platform located at Binance.com. Defendant CZ was Binance's primary founder, majority owner, and CEO and made the strategic decisions for Binance and exercised day-to-day control over its operations and finances. Additionally, in his pursuit of maximizing revenues and market share, CZ oversaw and directed Binance's strategy of willfully disregarding KYC and AML laws and regulations so that customers could use Binance.com anonymously, from the United States, and from sanctioned jurisdictions.

191. Defendant BAM Trading is a Delaware corporation with a principal place of business in Miami, Florida. BAM Management is a Delaware corporation and the parent of BAM Trading and other affiliated entities. When the Binance.US Platform launched in 2019, BAM Management was wholly owned by BAM Management Company

Limited, a Cayman Islands company, which in turn was wholly owned by CPZ Holdings Limited, a British Virgin Islands company that was owned and controlled by CZ.

192. CZ, along with a core senior management group, made the strategic decisions for Binance, BAM Trading, and the Binance Platform, and exercised day-to-day control over their operations and finances.

193. Defendants CZ and Binance, including the Binance.com platform, constituted an "enterprise" (the "Binance Crypto-Wash Enterprise") within the meaning of 18 U.S.C. §1961(4) since the start of the relevant period, through which Defendants Binance and CZ (and later BAM Trading) conducted the pattern of racketeering activity described herein.

194. During 2019, in connection with and in furtherance of the Binance Crypto-Wash Enterprise, Binance and CZ expanded the Binance Crypto-Wash Enterprise to include Defendant BAM Trading, including the Binance.US platform. At all times relevant herein, CZ owned 100 percent of CPZ Holdings Limited, which owned 100 percent of BAM Management Company Limited, which in turn owned 81 percent of BAM Management, which in turn owned 81 percent of BAM Trading, including Binance.US. Alternatively, BAM Trading and the Binance.US platform were associated-in-fact with Binance and CZ for a number of common and ongoing purposes, including executing and perpetrating the scheme alleged herein, and

constituted an "enterprise" within the meaning of 18 U.S.C. §1961(4), the activities of which affected interstate commerce, because it involved commercial and financial activities across state lines, including through the operation of websites over the Internet and the transmission of cryptocurrency.

195. Therefore, the Binance Crypto-Wash Enterprise operated the Binance.com platform beginning in 2017 and operated both the Binance.com and Binance.US platforms beginning in 2019 (collectively, the "Binance Platform"). Zhao has directly or indirectly owned the various entities that collectively operate the Binance Platform. The Binance Crypto-Wash Enterprise engaged in, and its activities affected, interstate commerce, including through the operation of websites over the Internet and through the transmission of cryptocurrency.

196. CZ has directly or indirectly owned the various entities that collectively operate the Binance Platform. CZ, along with a core senior management group, made the strategic decisions for Binance, BAM Trading and the Binance Platforms and exercised day-to-day control over their operations and finances.

197. Defendant CZ exercised substantial control over the affairs of the Binance Crypto-Wash Enterprise, through, among other methods and means, the following:

a. Providing the initial operating capital and holding most of the shares of Binance and holding approximately

81 percent of the shares of BAM Trading;

b.    Devising the strategy to maximize revenues and gain market share by violating the BSA by willfully causing Binance.com to fail to implement and maintain the necessary KYC requirements or an effective AML program;

c.    Communicating to Binance's employees his overall strategy of maximizing revenues and gaining market share by not requiring the collection of the necessary KYC information and thereby willfully violating KYC and AML laws;

d.    Deciding to create BAM Trading and orchestrating the scheme to use Binance.US as a distraction for U.S. regulators so that Binance.com could continue serving U.S. customers and customers from sanctioned jurisdictions; and

e.    Managing the day-to-day affairs of Binance.com and Binance.US with the purpose of ensuring Binance's most valuable customers could continue using the Binance.com platform.

198. Defendants Binance, BAM Trading and CZ exercised control over and directed the affairs of the Binance Crypto-Wash Enterprise through, among other things, using Binance's and BAM Trading's core senior management group to direct critical aspects of the Binance Crypto-Wash Enterprise operations, including the following:

a.    Individual 1 identified in the DOJ SOF served as Binance's CCO from April 2018 until around June 2022. Individual

1 built and directed the compliance protocols of Binance and BAM Trading, which failed to comply with KYC and AML laws and regulations. Individual 1 also instructed other Binance employees to avoid complying with those laws, communicated Defendant CZ's strategy of willfully avoiding the laws, and provided suggestions to employees about what to communicate to customers to ensure they could continue to use Binance.com, even though it violated KYC and AML laws and regulations.

   b. CZ and Individuals 1, 3, and 4 encouraged users to conceal and obfuscate their U.S. connections, including by creating new accounts and submitting non-U.S. KYC information in connection with those accounts. Senior Binance leaders discussed this strategy on internet-based calls in or around June 2019.

   c. CZ and Individuals 1 and 2 helped launch the new U.S. exchange, including registering it as an MSB with FinCEN and obtaining state money transmitting licenses.

  199. The Binance Crypto-Wash Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. §1961(4), as individuals and other entities associated-in-fact for the common purpose of engaging in Defendants' profit-making scheme.

  200. The Binance Crypto-Wash Enterprise was an ongoing and continuing organization consisting of legal entities, such as a corporation and limited liability company, as well as individuals

associated for the common or shared purpose of ensuring that Binance did not implement adequate KYC or AML policies so that Binance.com could generate massive fees and liquidity from the maximum number of people and increase market share, in violation of the law.

201. The Binance Crypto-Wash Enterprise functions by generating fees from cryptocurrency transactions by customers. Many customers were not bad actors and used the Binance Platform for legitimate purposes. However, Defendants, through the Binance Crypto-Wash Enterprise, have engaged in a pattern of racketeering activity which also enabled bad actors to use the Binance Platform to launder stolen cryptocurrency so that it could not be tracked or recovered.

202. The Binance Crypto-Wash Enterprise engages in and affects interstate commerce because it involves commercial and financial activities across state boundaries, such as through the operation of the Binance.com and Binance.US platforms over the Internet and through the transmission of cryptocurrency into and out of Binance.com, and over Binance.com's exchange.

203. At all relevant times herein, each participant in the Binance Crypto-Wash Enterprise was aware of the scheme.

204. Defendants were each knowing and willing participants in the scheme and reaped revenues and/or profits therefrom.

205. The Binance Crypto-Wash Enterprise has an

ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants engaged. The Binance Crypto- Wash Enterprise is separate and distinct from each of the Defendants.

**RICO Conspiracy**

206. Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy.

207. Defendants have engaged in a conspiracy to maximize revenues and/or market share for Defendants and their unnamed co-conspirators through the scheme alleged herein.

208. The objectives of the conspiracy are: (a) to execute the scheme; (b) to enable customers to use Biance.com without Binance.com requiring KYC or implementing AML policies, including U.S.-based users and users from sanctioned jurisdictions; and (c) to gain market share and maximize fees and liquidity.

209. To achieve these goals, Defendants willfully disregarded U.S. laws and regulations and encouraged bad actors to launder crypto at Binance.com. Defendants have also agreed to participate in other illicit and fraudulent practices, all in exchange for agreement to, and participation in, the conspiracy.

210. Each Defendant and member of the conspiracy, with knowledge and intent, has agreed to the overall objectives of the conspiracy and participated in the common course of conduct to enable U.S.-based users and sanctioned users to launder crypto

at Binance.com.

211. As a result of Defendants' illegal scheme and conspiracy, Plaintiffs had crypto taken from him as a result of hacks, ransomware, or theft and laundered at Binance.com. But for Defendants' scheme, Plaintiff would not have had their crypto stolen and then laundered at Binance.com so that the crypto was no longer traceable on the blockchain. Therefore, the damages that Defendants caused Plaintiff may be measured, at a minimum, by the maximum dollar value of the cryptocurrency since May 8, 2021 taken from Plaintiff as the result of illegal conduct, such as hacks, ransomware, or theft, which was laundered through Binance.com.

**Pattern of Racketeering Activity**

212. Defendants, each of whom is a person associated-in-fact with the Binance Crypto-Wash Enterprise, knowingly, willfully, and unlawfully conducted or participated, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§1961(1), 1961(5) and 1962(c). The racketeering activity was made possible by Defendants' regular and repeated use of the facilities, services, distribution channels, and employees of the Binance Crypto-Wash Enterprise.

213. Defendants each committed multiple "Racketeering Acts," as described below, including aiding and abetting such

acts.

214. The Racketeering Acts were not isolated, but rather were related in that they had the same or similar purposes and results, participants, victims, and methods of commission. Further, the Racketeering Acts were continuous, occurring on a regular, and often daily, basis beginning in May 2021 and depending upon the act, continuing until today, and the harm of those Racketeering Acts continue to today.

215. Defendants participated in the operation and management of the Binance Crypto- Wash Enterprise by directing its affairs, as described above.

216. In devising and executing the scheme to enable Binance.com to be used by U.S.-based customers and sanctioned users, including bad actors laundering cryptocurrency, Defendants *inter alia*, (i) committed, and aided and abetted, acts constituting indictable offenses under 18 U.S.C. §1960 (relating to illegal money transmitters) and 18 U.S.C. §1961(1)(E) (act indictable under the Currency and Foreign Transactions Reporting Act a/k/a the Bank Secrecy Act (BSA), and (ii) aided and abetted acts constituting indictable offenses under 18 U.S.C. §§1956 (laundering of monetary instruments), 1957 (engaging in monetary transactions in property derived from specified unlawful activity), and 2314 (relating to interstate transportation of stolen property). For the purpose of executing the scheme to

maximize revenues and market share for Binance.com in violation of KYC and AML rules and regulations, Defendants committed these Racketeering Acts, which number in the millions, intentionally, and knowingly with, the specific intent to advance the illegal scheme.

217. Defendants committed, and aided and abetted, acts constituting indictable offences under 18 U.S.C. §1960 (relating to illegal money transmitters) and the BSA as follows:

a. Defendants understood that because Binance.com served a substantial number of U.S. users, it was required to register with FinCEN as an MSB and therefore required under the BSA to implement an effective AML program. In fact, Defendants willfully violated the BSA by enabling and causing Binance.com to have an ineffective AML program, including a failure to collect or verify KYC information from a large share of its users.

b. Defendants Binance and CZ, aided and abetted by Defendant BAM, conducted, and conspired to conduct, Binance as an unlicensed MTB in violation of 18 U.S.C. §§1960(a) and 1960(b)(1)(B), and failed to maintain an effective AML program, in violation of the BSA, including, 31 U.S.C. §§5318(h), 5322.

c. Binance was required to develop, implement, and maintain an effective AML program that was reasonably designed to prevent Binance.com from being used to facilitate money

laundering and the financing of terrorist activities, and Defendants Binance and CZ willfully failed to do so in violation of 31 U.S.C. §5318(h)(1) and 31 C.F.R. §1022.210. Additionally, Binance was required to accurately, and timely, report suspicious transactions to FinCEN, and Defendants Binance and CZ willfully failed to do so in violation of 31 U.S.C. §5318(g) and 31 C.F.R.§1022.320.

 d. Defendants CZ and BAM Trading aided and abetted the conducting of Binance as an unlicensed MTB in violation of 18 U.S.C. §§1960(a) and 1960(b)(1)(B); and 2, as CZ admitted in his prior plea agreement with the DOJ, and in that Binance.US was used to distract U.S. regulators from focusing on Binance's violations of the law which enabled Binance.com to act as an unlicensed MTB without adequate KYC or AML policies and serve U.S.-based bad actors and customers from sanctioned jurisdictions. As alleged above, Defendants Binance, CZ, and BAM Trading created Binance.US as a distraction to regulators to enable Binance to continue doing business with U.S.-based customers and customers located in sanctioned jurisdictions, including bad actors who used Binance.com to launder cryptocurrency taken from Plaintiff a result of hacks, ransomware, or theft.

 e. These Racketeering Acts were not isolated, but

rather were related in that they had the same or similar purposes and results, participants, victims, and methods of commission.

f.   As a result of Binance's and CZ's failure to implement adequate controls requiring KYC and AML policies and blocking illegal transactions with sanctioned users and bad actors, Defendants Binance and CZ willfully enabled bad actors to launder cryptocurrency at Binance.com.

218. Additionally, Defendants aided and abetted acts constituting indictable offenses under 18 U.S.C. §§ 1956 (laundering of monetary instruments), 1957 (engaging in monetary transactions in property derived from specified unlawful activity), and 2314 (relating to interstate transportation of stolen property) as follows:

a.   Defendants' scheme of maximizing revenues from all customers, including bad actors and users in sanctioned jurisdictions, by failing to implement KYC and AML procedures for Binance.com, turned Binance.com into a hub and magnet for criminals and other bad actors to launder cryptocurrency. The operation of Binance.com as a means to launder crypto aided and abetted the laundering of the crypto by bad actors.

b.   Since approximately July 2017, Binance.com processed millions of dollars in transactions by bad actors who took cryptocurrency from Plaintiff as a result of hacks, ransomware, or theft and utilized Binance.com to launder the

crypto and/or to transfer the crypto through their Binance.com accounts and out of Binance.com in violation of 18 U.S.C. §1956 (laundering of monetary instruments) and 18 U.S.C. §1957 (engaging in monetary transactions in property derived from specified unlawful activity). Additionally, the illegally obtained cryptocurrency was transported, transmitted, or transferred in interstate or foreign commerce to or from Binance.com in violation of 18 U.S.C. §2314 (relating to interstate transportation of stolen property). Defendants Binance and CZ aided and abetted those actions constituting indictable offenses.

       c.    These Racketeering Acts were not isolated, but rather were related in that they had the same or similar purposes and results, participants, victims, and methods of commission. For example, between August 2017 and April 2022, there were direct transfers of approximately $106 million in bitcoin to Binance.com wallets from Hydra, a popular Russian darknet marketplace frequently utilized by criminals. Similarly, from February 2018 to May 2019, Binance.com processed more than $275 million in deposits and more than $273 million in withdrawals from BestMixer – one of the largest cryptocurrency mixers in the world.

       d.    Furthermore, even though Binance and CZ have entered into a settlement with the DOJ and agreed to implement KYC and AML procedures, to this day bad actors continue to attempt

to use Binance.com as a means to launder crypto and have transferred stolen cryptocurrency to Binance.com as late as March 2024, if not later.

219. Defendants and third parties have exclusive custody or control over the records reflecting the precise dates, amounts, locations and details of the millions of transactions at Binance.com in violation of the Racketeering Acts in violation of 18 U.S.C. §1960 (relating to illegal money transmitters), 18 U.S.C. §1961(1)(E) (act indictable under the Currency and Foreign Transactions Reporting Act aka the Bank Secrecy Act ("BSA"), 18 U.S.C. §§1956 (laundering of monetary instruments), 1957 (engaging in monetary transactions in property derived from specified unlawful activity), and 2314 (relating to interstate transportation of stolen property).

## CAUSES OF ACTION

### COUNT I (Conversion)
### (Against Defendants Binance and CZ)

220. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 through 219 above.

221. At the time his cryptocurrency was taken by bad actors by hacks, ransomware, or theft, Plaintiff owned and had the right to immediately possess the cryptocurrency in his private cryptocurrency wallet, protocol, and/or account at Coinbase, not just a mere right to payment for the value of that cryptocurrency.

Plaintiff also owned and had the right to immediately possess his stolen cryptocurrency that was later deposited into Binance.com addresses.

222. Plaintiff's cryptocurrency at issue is specific, identifiable property and can be traced to and from Binance.com accounts.

223. At all relevant times, Defendants had actual or constructive knowledge that cryptocurrency stolen from Plaintiff had been transferred to accounts on Binance's exchange.

224. Notwithstanding the knowledge of the custody of stolen assets in a Binance account, Binance accepted the benefit of exchanging Plaintiff's cryptocurrency for other cryptocurrency, thereby converting Plaintiff's cryptocurrency.

225. Defendants knowingly maintained inadequate KYC and AML policies which enabled cryptocurrency hackers and thieves to launder cryptocurrency through the Binance ecosystem without providing valid or sufficient personal identification and proof of lawful possession of the cryptocurrency.

226. Defendants knew Binance KYC and AML policies and procedures, including any tracing analysis of where funds originated, were nonexistent or inadequate. Nevertheless, those inadequacies were ignored, and no effort was taken to utilize reasonable measures to remedy those dangerous shortcomings.

227. Furthermore, Defendants knew that cryptocurrency was

transferred to Binance.com from previously identified illicit wallets, or refused to determine whether cryptocurrency was transferred to Binance.com from previously identified illicit wallets even though that information was either already in the Defendants' possession or readily available, and nevertheless wrongfully exercised dominion over that cryptocurrency.

228. As a result of the knowingly inadequate KYC and AML policies, Defendants were able to retain possession of stolen cryptocurrency, collect significant transaction fees, and drive revenue and profits by furthering their image as promoters of anonymous and unregulated financial transactions, attracting fraudsters and other transacting parties seeking to evade scrutiny.

229. The public nature of blockchain is why Plaintiff was able to determine, following a thorough investigation tracing the block chain, that a hacker had deposited his crypto currency with Defendants.[48]

230. Plaintiff is entitled to the value of his stolen cryptocurrency placed in Binance.com addresses and an amount of damages to be proven at trial, plus interest.

<u>**COUNT II (Aiding and Abetting Conversion)**</u>
<u>**(Against All Defendants)**</u>

231. Plaintiff re-alleges, and adopts by reference herein,

---

[48] See **"Exhibit A."**

Paragraphs 1 through 229 above.

232. At the time his cryptocurrency was taken by bad actors by hacks, ransomware, or theft, Plaintiff owned and had the right to immediately possess the cryptocurrency in his private cryptocurrency wallet, protocol, and/or account at Coinbase, not just a mere right to payment for the value of that cryptocurrency.

233. Plaintiff's cryptocurrency assets at issue are specific, identifiable property and can be traced to and from Binance.com accounts.

234. At all relevant times, Defendants had actual knowledge that cryptocurrency stolen from Plaintiff had been transferred to accounts on Binance.com's exchange. Furthermore, Defendants knew that the cryptocurrency was taken from Plaintiff because the cryptocurrency was transferred to Binance.com from previously identified illicit wallets, or Defendants refused to determine whether the cryptocurrency was transferred to Binance.com from previously identified illicit wallets as required by law even though that information was either already in Binance's possession or readily available.

235. Notwithstanding the actual knowledge of the custody of stolen assets in a Binance address, Binance did not halt the further movement of that stolen property, which allowed a thief to abscond with, and convert to their own benefit, Plaintiff's property. Instead, Binance enabled thieves to complete the

conversion of cryptocurrency assets.

236. Defendants rendered knowing and substantial assistance to cryptocurrency thieves in their commission of conversion through which they obtained Plaintiff's and cryptocurrency, such that they culpably participated in the conversion.

237. Defendants ignored their own internal policies and procedures and knowingly maintained inadequate KYC and AML policies which enable cryptocurrency hackers and thieves to launder cryptocurrency through the Binance ecosystem without providing valid or sufficient personal identification and proof of lawful possession of the cryptocurrency.

238. Defendants knew that the Binance.com KYC and AML policies and procedures, including any tracing analysis of where funds originated, were nonexistent or inadequate. Nevertheless, they ignored those inadequacies and made no effort to utilize reasonable measures to remedy those dangerous shortcomings. This amounts to "driving the getaway car" for the cryptocurrency thieves with full awareness of the harm being committed.

239. As a result of the knowingly inadequate KYC and AML policies, Defendants were able to collect significant transaction fees and drive revenue and profits by furthering their image as promoters of anonymous and unregulated financial transactions, attracting fraudsters and other transacting parties seeking to evade scrutiny.

240. In effect, Defendants were consciously participating in the conversion of Plaintiff's cryptocurrency to drive their revenue and profits, such that their assistance in the conversion was pervasive, systemic, and culpable.

241. Defendants knew that Binance.US was being used as a distraction for regulators so that Binance.com could continue serving U.S.-based customers and users from sanctioned entities and that Binance.com had become a magnet and hub for bad actors to launder cryptocurrency.

242. Plaintiff is entitled to the value of his stolen cryptocurrency and an amount of damages to be proven at trial, plus interest.

### COUNT III (Unjust Enrichment)

243. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 through 242 above.

244. As a result of the stolen cryptocurrency laundered through Binance accounts, Defendants were able to collect significant transaction fees, and drive revenue and profits by furthering their image as promoters of anonymous and unregulated financial transactions, attracting fraudsters and other transacting parties seeking to evade scrutiny.

245. Plaintiff conferred benefits upon Defendants in the form of the transaction fees for their cryptocurrency.

246. It would be inequitable for Defendants to retain those benefits, including profits derived from those benefits.

247. Defendants should reimburse Plaintiff for the inequitable retention of the transaction fees, and disgorge their ill-gotten gains to be returned for Plaintiff.

## COUNT IV Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c)-(d) (Against All Defendants)

248. Plaintiff re-alleges, and adopts by reference herein, Paragraphs 1 through 247 above.

249. This claim arises under 18 U.S.C. §§ 1962(c) and (d), which provide in relevant part:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...

> (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection ...(c) of this section.

250. At all relevant times, Defendants were "persons" within the meaning of 18 U.S.C. § 1961(3), because each Defendant was an individual or "capable of holding a legal or beneficial interest in property." Defendants were associated with an illegal enterprise, as described below, and conducted and participated in that enterprise's affairs through a pattern of racketeering activity, as defined by 18 U.S.C. § 1961(5), consisting of

numerous and repeated uses of the interstate wire communications to execute a scheme to operate Binance.com in violation of 18 U.S.C. § 1962(c).

251. The Binance Crypto-Wash Enterprise was created and/or used as a tool to carry out the elements of Defendants' illicit scheme and pattern of racketeering activity. The Binance Crypto-Wash Enterprise has ascertainable structures and purposes beyond the scope and commission of Defendants' predicate acts and conspiracy to commit such acts. The enterprise is separate and distinct from Defendants.

252. The members of the RICO enterprise all had the common purpose to maximize Binance's revenues and market share by running Binance.com as a crypto exchange with virtually non-existent KYC or AML policies to serve U.S.-based customers and customers from sanctioned jurisdictions, including bad actors who engaged in the laundering of cryptocurrency obtained as the result of hacks, ransomware, and theft.

253. The Binance Crypto-Wash Enterprise has engaged in, and its activities affected, interstate and foreign commerce by operating two websites on the Internet (Binance.com and Binance.US) which served customers located throughout the United States, and received and sent cryptocurrency throughout the United States and the world and operated cryptocurrency exchanges facilitating the exchange of cryptocurrency between users in the

United States and around the world.

254. The Binance Crypto-Wash Enterprise actively disguised the nature of Defendants' wrongdoing and concealed or misrepresented Defendants' participation in the conduct of the Binance Crypto-Wash Enterprise to maximize profits and market share while minimizing their exposure to criminal and civil penalties.

255. Each Defendant exerted substantial control over the Binance Crypto-Wash Enterprise, and participated in the operation and managed the affairs of the enterprise as described herein.

256. Defendants have committed or aided and abetted the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1960, 1961(1)(E), 1956, 1957, and 2314, within the past ten years. The multiple acts of racketeering activity which Defendants committed and/or conspired to, or aided and abetted in the commission of, were related to each other, began in 2017 and would have continued and posed a threat of continued racketeering activity if it were not for the DOJ and other actions against Defendants, and therefore constitute a "pattern or racketeering activity."

257. Even after Defendants Binance and CZ agreed to comply with AML and KYC regulations and settled with the DOJ, some of the acts of racketeering activity are continuing since bad actors continue to launder crypto at the Binance Crypto-Wash Enterprise,

including stolen crypto sent to Binance.com as late as March 2024.

258. Defendants' predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to:

a. **Operated Unlicensed MTB and Violated BSA:** Defendants Binance and CZ, aided and abetted by Defendant BAM Trading, conducted, and conspired to conduct, Binance.com as an unlicensed MTB from approximately July 2017 to at least October 2022 in violation of 18 U.S.C. §§ 1960(a) and (b)(1)(B), and failed to maintain an effective AML program, in violation of the BSA, including 31 U.S.C. §§ 5318(h), 5322. Defendants willfully violated the BSA by causing Binance to have an ineffective AML program, including a failure to collect or verify KYC information from a large portion of its users.

b. Defendants CZ and BAM Trading aided and abetted the conducting of Binance.com as an unlicensed MTB in violation of 18 U.S.C. §§ 1960(a) and (b)(1)(B); and used Binance.US to distract U.S. regulators from focusing on Binance's violations of the law which enabled Binance.com to act as an unlicensed MTB without adequate KYC or AML policies and serve U.S.-based bad actors and customers from sanctioned jurisdictions.

105

Defendants' failure to implement KYC or AML policies and targeting of U.S.-based users turned Binance.com into a magnet and hub for illicit cryptocurrency transactions.

259. **Money Laundering and Transportation of Stolen Property:** Binance.com processed millions of dollars in transactions by bad actors who took cryptocurrency from Plaintiff through hacks, ransomware, theft and/or deceptive conduct and utilized Binance.com to remove the ability to track the crypto and/or to transfer the crypto through their Binance.com accounts and/or out of Binance.com in violation of 18 U.S.C. § 1956 (laundering of monetary instruments) and 18 U.S.C. § 1957 (engaging in monetary transactions in property derived from specified unlawful activity). Additionally, the illegally obtained cryptocurrency was transported, transmitted, or transferred in interstate or foreign commerce to or from Binance.com in violation of 18 U.S.C. § 2314 (relating to interstate transportation of stolen property). Defendants aided and abetted those violations as alleged above.

260. Many of the precise dates and details of the use of Binance.com to launder and transfer cryptocurrency cannot be alleged without access to Defendants' books and records. Indeed, the success of Defendants' scheme depended on secrecy, and Defendants have withheld details of the scheme from Plaintiff.

Generally, however, Plaintiff has described occasions on which the predicate acts alleged herein would have occurred. They include the transfer of millions of dollars in cryptocurrency over several years.

261. Defendants have obtained money and property belonging to Plaintiff as a result of these statutory violations. Plaintiff has been injured in his business or property by Defendants' overt acts, and by their aiding and abetting the acts of others.

262. In violation of 18 U.S.C. § 1962(d), Defendants conspired to violate 18 U.S.C. § 1962(c), as alleged herein. Various other persons, firms, and corporations, not named as defendants in this Complaint, have participated as co-conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy.

263. Each Defendant aided and abetted violations of the above laws, thereby rendering them indictable as a principal in the 18 U.S.C. §§ 1960, 1961(1)(E), 1956. 1957, and 2314, offenses pursuant to 18 U.S.C. § 2.

264. Plaintiff has been injured in his property by reason of Defendants' violations of 18 U.S.C. §§ 1962(c) and (d), including the value of his cryptocurrency taken by bad actors which was transferred to Binance.com. In the absence of Defendants' violations of 18 U.S.C. §§ 1962(c) and (d), Plaintiff would not have had his crypto taken and laundered through Binance.com.

265. Plaintiff's injuries were directly and proximately caused by Defendants' racketeering activity.

266. Defendants willfully violated the laws requiring KYC and AML policies and knew that bad actors were transferring crypto to and from Binance.com, and exchanging that crypto on Binance.com's exchange, and that, as a result, the crypto would no longer be trackable on the public blockchain.

267. Under the provisions of 18 U.S.C. § 1964(c), Plaintiff is entitled to bring this action and to recover treble damages, the costs of bringing this suit and reasonable attorneys' fees. Defendants are accordingly liable to Plaintiff for three times his actual damages as proven at trial plus interest and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for relief as follows:

(a) Declaring that Defendants committed civil RICO violations pursuant to 18 U.S.C. §§ 1962(c)-(d);

(b) Declaring that Defendants' actions, as set forth above, converted Plaintiff's cryptocurrency, or alternatively, aided and abetted conversion of that cryptocurrency, where they knowingly failed to follow KYC or AML policies;

(c) Declaring that Defendants were unjustly enriched by their collection of transaction fees on Plaintiff's

stolen cryptocurrency;

(d) Awarding Plaintiff actual, compensatory, and treble damages as allowed by applicable law;

(e) Awarding Plaintiff restitution and disgorgement of Defendants' ill-gotten gains;

(f) Enjoining Defendants from continuing to commit the violations alleged herein, freezing all cryptocurrency in Defendants' possession which belongs to Plaintiff, ordering the return of cryptocurrency taken from Plaintiff, and ordering other necessary injunctive relief;

(g) Awarding pre-judgment and post-judgment interest at the highest rate allowed by applicable law;

(h) Awarding costs, including experts' fees, and attorneys' fees and expenses, and the costs of prosecuting this action; and

(i) Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demand a trial by jury, pursuant to Fed. R. Civ. P. 38(b), on all issues so triable.

Dated: November 4, 2024

Respectfully submitted,

/s/ Robert A. Tandy

Robert A. Tandy, Esq.(RT0387)

Law Office of Robert A. Tandy, LLC

50 Tice Boulevard, Suite 250

Woodcliff Lake, NJ 07677

Phone: (201) 474-7103

Fax: (201) 474-7103

Email: rtandy@tandylaw.com

Co-Counsel for Plaintiff, David Gonzalez


 /s/ Eric J. Warner

Eric J. Warner, Esq. (EW3946)

LAW OFFICE OF ERIC J. WARNER, LLC

991 US Highway 22, Suite 200

Bridgewater, NJ 08807

Phone: (201) 403-5937

Fax: (877) 360-0508

Email: eric@ejwlawfirm.com

Co-Counsel for Plaintiff, David Gonzalez